IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2001 Session

**RIVER PARK HOSPITAL, INC.**

**v.**

**BLUECROSS BLUESHIELD OF TENNESSEE, INC., and
VOLUNTEER STATE HEALTH PLAN, INC., d/b/a BLUECARE**

**An Appeal from the Chancery Court for Warren County
No. 7266    Charles D. Haston, Chancellor**

**No. M2001-00288-COA-R3-CV - Filed October 11, 2002**

This case involves a dispute over rates paid to a TennCare health care provider. The plaintiff hospital had been a participating provider for the defendant TennCare managed care organization ("MCO") for several years, being paid an agreed contractual rate for services provided to the MCO's enrollees. When the parties' contract expired, it was not renewed. After expiration of the contract, the hospital continued to provide emergency services to the MCO's enrollees, as it was required to do under federal law. For those emergency services, the hospital billed the MCO at its full, standard rates. The MCO refused to pay the hospital's standard rates, and instead paid the hospital the same rate it had paid under the parties' expired contract. This was the same rate the MCO paid hospitals that were participating providers. The hospital filed this lawsuit against the MCO, seeking to recover its full, standard rates for the emergency services provided to the MCO's enrollees after expiration of the parties' contract. After hearing proof on liability, but not damages, the trial court initially denied recovery on all grounds. The hospital moved for reconsideration and to reopen the proof. The trial court granted the motion and ultimately determined that the MCO had been unjustly enriched by the hospital's provision of services to its enrollees. Both parties appealed. We affirm, finding a contract implied in law, and remand to the trial court to determine a reasonable rate for services provided by the hospital and, based on this, for a determination of damages.

**Tenn. R. App. P. 3; Judgment of the Chancery Court is Affirmed and Remanded**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Gary C. Shockley and Brigid M. Carpenter, Nashville, Tennessee, for the appellants, BlueCross BlueShield of Tennessee, Inc., and Volunteer State Health Plan, Inc., d/b/a/ BlueCare.

Steven A. Riley and Taylor A. Cates, Nashville, Tennessee, for the appellee, River Park Hospital, Inc.

William E. Young and William B. Hubbard, Nashville, Tennessee, for amicus curie, Tennessee Hospital Association.

Andrew Yarnell Beatty, Nashville, Tennessee, for amicus curie, Tennessee Medical Association.

**OPINION**

Plaintiff/Appellee River Park Hospital, Inc. ("River Park"), is a Tennessee corporation that operates a 127-bed hospital in McMinnville, Tennessee. Defendant/Appellant BlueCross BlueShield of Tennessee, Inc. ("BlueCross"), is a Tennessee not-for-profit corporation with its principal place of business in Chattanooga. Defendant/Appellant Volunteer State Health Plan, Inc. ("Volunteer State"), a Tennessee-licensed Health Maintenance Organization ("HMO"), is a subsidiary of BlueCross. Through Volunteer State, BlueCross participates as a managed care organization ("MCO") in TennCare, under the trade name "BlueCare."[1]

TennCare is Tennessee's Medicaid program. Medicaid was established by the federal government in 1965 to provide health coverage for low-income individuals, as opposed to the Medicare program designed to provide health coverage to the elderly.[2] *State ex rel. Pope v. Xantus Healthplan of Tennessee, Inc.*, No. M2000-00120-COA-R10-CV, 2000 Tenn. App. LEXIS 319, at *3 (Tenn. Ct. App. May 17, 2000). Under traditional "fee-for-service" Medicaid programs, the State pays health care providers directly for services administered to eligible individuals. Reimbursement rates for services provided to Medicaid enrollees are established by the State. The individual Medicaid enrollee is free to utilize the physician, hospital, or other health care provider of his choice. Likewise, the health care provider is free to accept or decline to treat Medicaid patients.

TennCare is different from the traditional fee-for-service Medicaid program, in that it is a managed care Medicaid system.[3] Under TennCare, the State of Tennessee enters into Contractor Risk Agreements ("risk agreements") with private MCOs. *Id.* at *7. Under the risk agreements, the MCO receives a monthly payment from the State known as a "capitation payment" for each eligible

---

[1] BlueCross BlueShield of Tennessee, Inc., and Volunteer State Health Plan, Inc., are collectively referred to in this Opinion as "BlueCare."

[2] Generally, the federal government, acting through the Health Care Financing Administration ("HCFA") of the Department of Health and Human Services, sets certain minimum standards for state Medicaid programs, such as TennCare, and provides partial funding for those programs. The states then supply the balance of the necessary funding and are responsible for delivery of covered services to eligible individuals. *State ex rel. Pope v. Xantus Healthplan of Tennessee, Inc.*, No. M2000-00120-COA-R10-CV, 2000 Tenn. App. LEXIS 319, at *3-*4 (Tenn. Ct. App. May 17, 2000).

[3] The purpose of utilizing this type of system was to control spiraling medical costs while broadening the covered population to include non-Medicaid insured and uninsurable persons. *See Xantus*, 2000 Tenn. App. LEXIS 319, at *5-*7. (Tenn. Ct. App. May 17, 2000). TennCare increased the covered population from 800,000 under Medicaid to 1.2 million under TennCare in one year. **See** *id.* at *8.

individual enrolled with that MCO ("enrollee"). In return for this capitation payment, the MCO must arrange for the provision of medically necessary services to its enrollee. *Id.* at *7-*8. In order to do this, each MCO develops a "network" of health care providers and negotiates with the health care providers to accept discounted rates for the services provided. *Id.* at *8. If the MCO pays less in provider fees than the total amount received in capitation payments, it earns a profit. If the amount spent on care exceeds the capitation payments, the MCO bears the loss. In this way, the MCOs, not the State, bear the financial risk involved in the administration of health care services to persons eligible for TennCare. *Id.*

Each eligible TennCare recipient enrolls with the MCO of his choice.[4] The MCO assigns each enrollee in its plan to a primary care physician, also referred to as the "PCP" or "gatekeeper." The MCO pays the PCP a per capita rate to perform his "gatekeeping" function, to ensure that each enrollee receives only medically necessary health care services and to refer the enrollee to other health care providers for the medically necessary health care services that the PCP could not provide, including hospitalization. If the MCO enrollee has an emergency situation, he may go directly to a hospital emergency room without first getting approval from his PCP. Under the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), a hospital *must* provide services to a person with an emergency medical condition until the person's condition has stabilized, without regard to whether the person has insurance. The MCO has obligations as well; under the risk agreements entered into by the MCOs with the State, the MCO is obligated to pay the health care provider for any emergency services provided to its enrollee.

BlueCare entered into a risk agreement with the State of Tennessee to become a TennCare MCO.[5] When the TennCare program began in 1994, BlueCare contracted with River Park for River Park to become a participating provider in the BlueCare network. The most recent version of BlueCare's contract with River Park, known as the "BlueCare Attachment" to the River Park Institution Agreement, was effective on October 1, 1996. The parties operated under the BlueCare Attachment from October 1, 1996, through December 31, 1999.

During the course of River Park's contractual relationship with BlueCare, River Park became dissatisfied with the rate of reimbursement paid by BlueCare. River Park was also frustrated with the amount of time and money required to follow BlueCare's elaborate "utilization management procedures" or "utilization review guidelines." BlueCare required compliance with these procedures in order to obtain payment for services rendered. In 1999, River Park lost $2.3 million on BlueCare enrollees. Consequently, by letter dated July 26, 1999, River Park gave notice to BlueCare that River Park would terminate its BlueCare Attachment effective January 1, 2000. River Park sought to renegotiate its contract with BlueCare to obtain a higher rate of reimbursement and simpler

---

[4]Indeed, MCOs compete to enroll individuals in their plan in order to receive more capitation payments. *Xantus*, 2000 Tenn. App. LEXIS 319, at *8.

[5]BlueCare served its notice to terminate participation in the TennCare system as an "at risk" insurance company effective July 1, 2000. As of that date, BlueCare became a "non-risk" administrative services organization, which acts as a clerical bill payer for the State.

reimbursement procedures. Through a series of meetings and conference calls, the parties' negotiations continued from October 1999 through March 2000.

Ultimately, the parties could agree to continue under the former contract only with respect to obstetrical services. Otherwise, the parties could not reach an agreement. Therefore, River Park became an out-of-network provider as of January 1, 2000. During the negotiations, BlueCare told River Park several times that if the parties could not agree on a new contract, BlueCare would pay River Park only the rate of reimbursement it had paid under the old contract, because BlueCare maintains a policy of paying out-of-network hospitals the same rate that it pays in-network hospitals. River Park refused to be bound by the terms of the old contract after January 1, 2000. River Park repeatedly insisted that if the parties could not reach a new agreement, River Park would charge BlueCare the hospital's reasonable, standard rates for services provided to BlueCare enrollees by River Park after that date. River Park told BlueCare that its acceptance of any payment by BlueCare "does not waive our right to full and complete payment required by law."

On March 2, 2000, the parties engaged in their last meaningful conference call in an attempt to settle their dispute. At that time, River Park told BlueCare that it would accept BlueCare's regular in-network rates for in-patient services, but said that it would require 48% of the full, standard charges for out-patient services provided during January and February 2000. For the period of March 1 through June 30, 2000, River Park said it would agree to accept BlueCare's regular in-network rate for all services, provided BlueCare would agree to pay River Park for all claims authorized by BlueCare, bypassing BlueCare's exhaustive utilization management procedures. BlueCare rejected River Park's proposal and made no counter-proposal.

On March 8, 2000, River Park filed this lawsuit. In its original complaint, River Park sought (1) a declaratory judgment that, pursuant to Tennessee Code Annotated § 56-32-209, BlueCare was required to notify its enrollees that its contract with River Park was terminated; (2) a declaratory judgment that River Park had no obligations under its previous agreement with BlueCare and that BlueCare was required to compensate River Park according to River Park's reasonable, standard rates; (3) a determination that BlueCare had impliedly agreed to pay River Park its reasonable, standard rates for services rendered to BlueCare enrollees after December 31, 1999, and that BlueCare had breached the implied agreement; and (4) a determination that BlueCare was unjustly enriched by its refusal to pay River Park's reasonable, standard rates for services rendered to BlueCare enrollees after December 31, 1999. River Park filed a motion for expedited discovery and a speedy trial. BlueCare filed its answer and a counterclaim. In its responsive pleading, BlueCare sought a declaratory judgment that its method of paying out-of-network providers the in-network rate is authorized by its risk agreement with the State and by the applicable TennCare regulations, Tenn. Comp. R. & Regs. ch. 1200-13-12-.08(1) and (2)(a) (hereinafter "Rule 1200-13-12-.08"). It asserted that Rule 1200-13-12-.08 set the rate to be paid to an out-of-network provider such as River Park at the same rate paid to an in-network provider for the same service.

On July 7, 2000, River Park was permitted to amend its complaint to add an additional theory of recovery based on the Tennessee Consumer Protection Act.[6] River Park also sought attorney's fees under Tennessee Code Annotated § 47-18-109(e), which provides for a discretionary award to a prevailing party under the Tennessee Consumer Protection Act. In answer to the amended complaint, BlueCare added a counterclaim for disparagement under Tennessee Code Annotated § 47-18-104(b)(8), based on letters from River Park to three local obstetricians. In the letters, River Park said that BlueCare was unresponsive to River Park's needs and that BlueCare's efforts to move obstetrics patients to in-network hospitals showed "Blue Cross's lack of concern for the healthcare needs of our patients in Warren County."

On July 27, 2000, the court entered an order bifurcating the trial into separate liability and damages phases. The liability phase of the trial took place on July 31 and August 1, 2000. During that phase, the parties presented the testimony of several witnesses regarding the business relationship between River Park and BlueCare, and regarding the system by which BlueCare paid River Park and other health care providers for services rendered to BlueCare patients. Terry Gunn, the CEO of River Park, testified two times during the hearing. He asserted that River Park had allowed its contract with BlueCare to expire because the hospital lost $2.3 million in caring for BlueCare patients in 1999. Gunn explained that this loss was caused by BlueCare's low reimbursement rates and its burdensome utilization review procedures. Gunn said that River Park repeatedly told representatives of BlueCare that it expected to be paid full, standard rates for services provided to BlueCare patients after the parties' contract expired on December 31, 1999. BlueCare, on the other hand, introduced evidence that BlueCare customarily paid out-of-network hospitals the in-network rates for services provided to BlueCare patients. The evidence showed that, consistent with its custom, BlueCare told River Park that it intended to pay River Park its out-of-network rates for services provided to BlueCare patients after the expiration of the parties' contract. BlueCare representative Michael Morton testified that he personally met with all of BlueCare's PCPs in 1999 to inform them that River Park would be an out-of-network hospital as of December 31 of that year.

At the conclusion of the proof, on August 29, 2000, the trial court entered an order on the issue of liability. The trial court described the sequence of events after the negotiations between BlueCare and River Park had reached an impasse:

Blue Care informed its PCP's to admit patients to other facilities. However, the PCP's only had admitting privileges at Riverpark. The PCP's called Blue Care on each of the [2]400 admissions in question and after showing a medical necessity, were authorized to admit to Riverpark, a now "non contract" provider. *Riverpark had the right to refuse the admission of each patient, but chose to admit* after informing Blue Care that it expected it's [sic] full regular payment, and informing Blue Care that it could transfer the patient to a participating facility. Blue Care did not transfer nor did it agree to pay any rate other than the old contract rate. The patient was treated and Blue Care *disallowed all 2400 claims*, necessitating

---

[6]The trial court denied River Park's attempt to add a claim based on a theory of conversion.

Riverpark to rebill and appeal its decision to obtain any payment, even though the admission was pre-approved. Blue Care reevaluated the admissions and undertook to show that many were not medically necessary.

(Emphasis added). Thus, the trial court's August 29 order was premised on its finding that River Park had the right to refuse to admit the patients at issue. The trial court denied River Park's request for a declaratory judgment that BlueCare was required to notify its enrollees that its contract with River Park was terminated, finding that River Park lacked standing to seek a declaratory judgment under Tennessee Code Annotated § 56-32-209, or, in the alternative, that the issue was moot. The trial court also rejected River Park's allegation of an express contract, an implied contract, unjust enrichment, conversion, and its claims based on the Consumer Protection Act.[7] The trial court observed:

> The Court finds that while there is no contract, expressed or implied, the Court does take note of Tenn Care Regulation 1200-13-1208. Riverpark is now under no contract and because the parties have not agreed on any rate, nothing less than the provider contract applies. Blue Care, by preapproving the enrollee admission as medically necessary, should be estopped from using its constructual [sic] utilization guidelines to later disapprove payment after service has been rendered as there is no contract.

The trial court concluded that "Riverpark is entitled to be paid for the preapproved, medically necessary admissions and Blue Care's arbitrary refusal to pay has caused Riverpark unnecessary expense and appeal. Riverpark's request for damages above the contract price on all theories is accordingly dismissed." The August 29 order did not address BlueCare's counterclaims for disparagement or its request for attorney fees, nor was the order certified as a final order.

On September 6, 2000, BlueCare filed a motion for additional findings on its counterclaims, which it claimed were not addressed in the trial court's August 29 order. On September 18, 2000, River Park filed a motion to set a trial date for the damages phase. Also on that date, River Park filed a motion for additional findings of fact and to modify the August 29, 2000 order, and River Park sought as well as to have the August 29 ruling certified as a final order so that the parties could appeal. In its motion for additional findings, River Park requested findings regarding the rate at which BlueCare must pay River Park for services rendered to persons who are deemed to be "emergencies" who, according to federal law, may not be refused by the hospital. Responding to BlueCare's motion for additional findings, River Park asserted that BlueCare was not entitled to seek additional findings on their counterclaims, because those claims were nonmeritorious. BlueCare responded to River Park's motions, stating that the original order had already addressed the issues presented by River Park, and that River Park had not presented any new facts or evidence that warranted reconsideration of the trial court's initial conclusions. On September 29, 2000, River Park

---

[7]The trial court specifically rejected River Park's conversion claim, even though it had refused to allow River Park to add that claim to its complaint.

filed an amended motion for additional findings, asking the trial court to reopen the proof regarding the provision of emergency services to BlueCare enrollees. BlueCare opposed that motion on the grounds that all of the proof on that issue had been available at the trial on the liability phase, and thus River Park had provided the trial court with no basis for reopening the proof. BlueCare also sought discretionary costs under Rule 54.02(2) of the Tennessee Rules of Civil Procedure.

On November 27, 2000, the trial court held a hearing on all of the parties' post-trial motions. The trial court granted River Park's motion to reopen the proof and, at the hearing, allowed River Park to call two additional witnesses. River Park presented testimony from Dr. Otis Campbell, a local physician serving as a PCP for BlueCare. Dr. Campbell testified that all of his patients admitted to River Park after January 1, 2000, were emergencies, and that all other BlueCare enrollees admitted to River Park by other physicians since January 1, 2000, were also emergencies. River Park also presented additional testimony from Terry Gunn, the CEO of River Park, who had testified at the July 31 trial. Gunn testified that all of River Park's admissions of BlueCare enrollees since January 1, 2000, were emergency admissions, and that River Park had directed all elective BlueCare patients to other facilities since that date.

On December 14, 2000, the trial court entered an order that superceded the August 29 order. As in the August 29 order, the trial court rejected River Park's request for a declaratory judgment that BlueCare was required to notify enrollees, River Park's assertion that BlueCare breached an express or implied contract, its claim of conversion, and its claims under the Tennessee Consumer Protection Act. The trial court, however, changed its ruling on River Park's claim of unjust enrichment and held in favor of River Park. The trial court determined that, contrary to its initial findings in the August 29 order, River Park did *not* have the right to refuse the admission of each BlueCare patient. Rather, the trial court found that, for the 127 inpatient admissions at issue, "River Park had no choice but to provide these patients with hospital services" because they were all emergency admissions. With respect to patients who visited River Park's emergency room, the trial court found:

> Between January 1, 2000 and June 30, 2000, there were 1799 visits by BlueCare enrollees to River Park's emergency room. Since June 30, 2002, there have been many more. BlueCare has only paid River Park amounts calculated at BlueCare's old contract rate for those visits and refused to pay River Park's bills at is regular, customary rates as invoiced. By federal law River Park must provide these emergency services to any patient without regard to insurance until the patient is stabilized. BlueCare is legally obligated by its contract with the State to pay for emergency medical services provided to its enrollees. There was no agreement concerning the amount of payment for these emergency services.

Based on these new findings, the trial court held that BlueCare had been unjustly enriched by receiving services provided to its enrollees by River Park after January 1, 2000.[8] BlueCare's counterclaims based on disparagement and the Consumer Protection Act were rejected, and the trial court denied BlueCare's motion for discretionary costs. The December 14 order was certified as final for purposes of appeal pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Both parties now appeal that order.[9] In addition, the Tennessee Hospital Association and the Tennessee Medical Association have filed amicus curie briefs.

BlueCare first argues that the trial court erred in reopening the proof and in making additional findings of fact because all of the proof was available prior to the July 31 hearing on liability. BlueCare also claims that it was error to admit River Park's post-trial evidence because it violated the personal knowledge, hearsay, and best evidence rules. BlueCare claims as well that the evidence should be excluded because River Park violated the discovery rules by failing to disclose information. On the trial court's ruling that BlueCare was unjustly enriched by receiving River Park's treatment of its enrollees, BlueCare maintains that even if BlueCare were enriched, such enrichment was not unjust. BlueCare also argues that the trial court erred in denying its counterclaims based on disparagement and the Consumer Protection Act. Finally, BlueCare asserts that the trial court erred in rejecting its claim for discretionary costs.

River Park appeals as well, arguing that the trial court erred in dismissing its breach of contract, conversion, and Consumer Protection Act claims. However, River Park asks this Court to affirm the trial court's conclusion that BlueCare was unjustly enriched, its denial of BlueCare's counterclaims, and its denial of BlueCare's motion for discretionary costs. In their amicus briefs, the Tennessee Hospital Association and the Tennessee Medical Association join in the arguments made by River Park on the claim of unjust enrichment. The Tennessee Hospital Association argues that the rate of reimbursement for an out-of-network provider such as River Park is governed by the common law, not the regulation relied upon by BlueCare.

We review the trial court's findings of fact de novo upon the record, accompanied by a presumption of correctness of those findings unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We afford no such presumption to the trial court's conclusions of law. *See State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997); *Ridings v. Ralph M. Parsons Co.,* 914 S.W.2d 79, 80 (Tenn. 1996).

At the outset, BlueCare argues at length that the trial court abused its discretion in reopening the proof to allow for the admission of additional evidence and in changing its decision based on that

---

[8] In the December 14 order, the trial court again observed that BlueCare authorized all of the admissions at issue and, based on that authorization, River Park treated each patient. After treatment, BlueCare initially disallowed all of the claims. River Park was required to appeal in order to obtain any payment at all. The trial court noted, "This pattern continues through today."

[9] Because the trial court's December 14, 2000 order superceded its order filed on August 29, 2000, it is the December 14 order that is the subject of our review.

evidence. BlueCare emphasizes that all of the additional evidence submitted by River Park was available at the time of the July 31 hearing, and argues that, under *Harris v. Chern*, 33 S.W.3d 741 (Tenn. 2000), River Park has shown no justification for re-opening the proof. BlueCare has a valid point; however, assuming arguendo that the trial court erred in reopening the proof, any error in this regard would be harmless error. The additional testimony admitted in the November 27 hearing only reiterated the point argued by counsel in the July 31 hearing, namely, that River Park sought reimbursement only for services rendered in emergency cases, and established that the 127 inpatient cases listed in Exhibit 31 should be included in the category of emergency cases. River Park submitted substantial evidence at the July 31 hearing regarding the effects of EMTALA.[10] Moreover, it is undisputed that River Park is obligated under EMTALA to render services to emergency patients without regard to insurance. Therefore, the trial court's initial conclusion that River Park "had the right to refuse the admission of each patient" authorized by BlueCare was obviously wrong. Clearly, the trial court could correct its erroneous factual finding, and it could have done so without the benefit of additional evidence. The trial court indicated at the November 27 hearing that it was inclined to reconsider its earlier finding, commenting that it had "had second thoughts about the issue of unjust enrichment" prior to the rehearing.[11]

One of the trial court's revised findings may have been based on the additional testimony, namely, that the 127 inpatient admissions listed in Exhibit 31 were emergency cases. This proof, however, is not determinative of the overall issue of whether River Park is entitled to receive additional compensation for providing emergency services to BlueCare enrollees. Rather, it is pertinent to the amount of additional compensation to which River Park is entitled, i.e., the damages. Thus, had the trial court not heard this testimony at the November 27 hearing, it could hear the evidence in the damages phase of the bifurcated proceedings.[12] Under all of these circumstances, we must conclude that, even assuming the trial court erred in admitting additional testimony, any such error must be deemed harmless and is not a basis for reversal on appeal. This holding pretermits BlueCare's arguments that the additional testimony was not admissible because it violated the personal knowledge, hearsay and best evidence rules, and the argument that it should have been excluded because River Park violated the discovery rules.

---

[10] River Park's counsel stated at oral argument that "much of [this evidence] was in the record," but that the trial court either did not understand it initially or did not appreciate it. Counsel acknowledged that much of the evidence was duplicative.

[11] After the trial court had heard the additional proof, it observed that River Park's motion to amend was "[p]rimarily a motion to reconsider."

[12] From our review of the transcript of the July 31 hearing, it is unclear whether, in the beginning, River Park sought full compensation for both emergency and non-emergency services provided to BlueCare enrollees. Nevertheless, River Park clarified its position in its post-trial motions that it sought full compensation only for emergency services provided to BlueCare enrollees after December 31, 1999. The trial court held only that BlueCare was unjustly enriched as to River Park's treatment of emergency patients. Whether every patient for whom River Park seeks compensation was an emergency patient is relevant to damages, to determine the amount River Park will be entitled to recover. Thus, as we have determined, admitting evidence that relates to damages in the liability phase would be harmless.

Both parties argue issues related to their claims based on contract. River Park argues that the trial court erred in finding that the parties had no implied agreement that BlueCare would pay River Park its full standard rate for out-of-network emergency services provided to BlueCare enrollees. BlueCare maintains that the rate to be paid an out-of-network provider such as River Park is established by regulation, Rule 1200-13-12-.08, and that since this rule establishes the rate BlueCare paid, there was no unjust enrichment. We address first the regulation relied upon by BlueCare, and then discuss the existence of a contract.

BlueCare argues that it was authorized to pay River Park its in-network rates by Rule 1200-13-12-.08, which provides in pertinent part:

> (1) In situations where a managed care organization authorizes a service rendered by a provider who is not under contract with the managed care organization, payment to the provider *cannot be less than the amount that would have been paid to a provider under contract* with the managed care organization for the same service. As a condition of payment, *non-contract providers shall accept payment from managed care organizations as payment in full* except for applicable deductibles, co-payments and special fees.

> (2) Participation in the TennCare program will be limited to providers who:

> (a) *Accept, as payment in full, the amounts paid by the managed care organization*, including enrollee cost-sharing, or the amounts paid in lieu of the managed care organization by a third party (Medicare, insurance, etc.) . . . .

Tenn. Comp. R. & Regs. ch. 1200-13-12-.08(1) and (2)(a) (emphasis added). The parties agree that this regulation sets a "floor" for the payment for such services, by stating that "payment to the [out-of-network] provider cannot be less than the amount that would have been paid to [an in-network] provider." However, BlueCare insists that this regulation also creates a "ceiling," that is, a maximum required payment. BlueCare relies on the language in the regulation stating that, "[a]s a condition of payment, non-contract providers shall accept payment from managed care organizations as payment in full . . . ." BlueCare argues that the plain and ordinary meaning of the regulation is that, in order to participate in TennCare, non-network providers must accept the in-network rate from MCOs as payment in full.

River Park argues that the "shall accept" provision in the regulation is intended to be a prohibition on "balance billing," the practice of the provider billing the enrollee for any amount charged by the provider but not paid by the MCO. River Park asserts that the regulation requires the provider to accept payment from the MCO "as payment in full" only as against the enrollee, not as against the MCO. In other words, the regulation establishes a floor, but not a ceiling; it does not prevent the MCO and the provider from reaching an agreement for the MCO to pay an out-of-network provider a rate higher than that paid to in-network providers.

In support of its argument that the regulation relied upon by BlueCare is intended to prohibit balance billing, River Park notes that a Tennessee statute requires that TennCare provider contracts include a clause prohibiting billing the MCO enrollee for anything except "reasonable copayment and uncovered expenses." Tenn. Code Ann. § 56-32-205(c). Pursuant to this statute, the risk agreement entered into between the State of Tennessee and the MCO prohibits a provider from billing an enrollee for amounts other than deductibles, coinsurance and specifies "except as permitted by TennCare Rule 1200-13-12.08. . . ." Contractor Risk Agreement Paragraph 203.k. Both River Park and the Tennessee Hospital Association maintain that interpreting the regulation as requiring a health care provider that is out-of-network to accept as payment in full the reimbursement rate set by the MCO for in-network providers is inconsistent with one of the stated goals of TennCare, that is, to remove the State from being involved in setting rates for health care services and allow rates to be set by the market.

Considering the language in Rule 1200-13-12-.08 and the arguments on appeal, we must conclude that the regulation was intended to prevent balance billing as against an enrollee and was not intended to allow MCOs to unilaterally set maximum reimbursement rates for out-of-network providers. The language in the Rule is clearly a floor, stating expressly that the reimbursement rate for a non-contract provider "cannot be less" than the amount paid to a contract provider. There is, however, no language that makes this amount a ceiling; the regulation does not say that the amount paid to a non-contract provider "cannot be more" than the amount paid to a contract provider, nor does it say that the amounts paid to contract providers and non-contract providers must be the same. The regulation states that a non-contract provider "shall accept payment" from the MCO "as payment in full except for applicable deductibles, co-payments and special fees." This must be read in conjunction with the Tennessee statute requiring TennCare provider contracts to prohibit billing enrollees for anything except co-payments and uncovered expenses, as well as the risk agreement executed by BlueCare which prohibits a provider from billing an enrollee for anything other than deductibles, coinsurance and special fees "except as permitted by TennCare Rule 1200-13-12.08. . . ."

Indeed, BlueCare's interpretation would be anomalous to the whole TennCare scheme, whereby the State has disavowed the task of setting provider rates but instead seeks to rely on market forces. In setting up TennCare, the State submitted to the federal government a waiver request, seeking to waive certain Medicaid requirements in order to establish the TennCare program. In the TennCare Waiver Application, the State asserts that TennCare will use "traditional market forces to assure acceptable levels of price, quantity and quality of service." The Waiver Application states that "[t]he State will no longer be involved in setting the rates for individual providers." It would be contrary to this avowed goal to interpret the regulation as involving the State in setting maximum provider rates. Moreover, BlueCare's interpretation produces an inequitable result, giving BlueCare undue leverage in establishing reimbursement rates. BlueCare argues that the rate is set by "negotiation" and market forces, but the negotiation is between BlueCare and its in-network providers, not between BlueCare and River Park. It is unreasonable to require, by regulation, a health care provider who chooses to leave BlueCare's network because the reimbursement rates resulted in consistent losses to nevertheless be forced to accept the same reimbursement rates after

-11-

leaving BlueCare's network. On the whole, we conclude that Rule 1200-13-12-.08 must be interpreted to prohibit balance billing against MCO enrollees, and not to authorize MCOs to unilaterally cap reimbursement rates for non-contract providers. Thus, the reimbursement rate to be paid River Park in this case is not governed by Rule 1200-13-12-.08.

Consequently, we next address the issues related to breach of contract and unjust enrichment. River Park argues that the circumstances warranted a finding of at least an implied agreement, if not an express agreement, that BlueCare would pay River Park its full standard rates for emergency health care services provided to BlueCare enrollees. BlueCare maintains that the trial court did not err in finding there was no agreement, express or implied, that BlueCare would pay River Park's full standard rates, but argues that the trial court erred in finding unjust enrichment. BlueCare's argument is based in part on the regulation discussed above; in addition, BlueCare asserts that it repeatedly "advised" and "informed" River Park that BlueCare would pay no more than its standard in-network rates, as set out in the BlueCare provider services manual, and that this practice is consistent with "industry custom" for MCOs in Tennessee.

Generally, contracts can be either express, implied in fact, or implied in law. Express contracts and contracts implied in fact result from a meeting of the minds of the contracting parties; the parties mutually assent to the contract's terms. *See Whitmore v. Jones*, No. 02A01-9901-CV-00002, 1999 Tenn. App. LEXIS 430, at \*7-\*8 (Tenn. Ct. App. July 2, 1999) (citing *Johnson v. Central Nat'l Ins. Co. of Omaha*, 356 S.W.2d 277, 281 (Tenn. Ct. App. 1962)). In order to be enforceable, such contracts must be sufficiently definite and must be based on consideration. *Id.* The primary difference between an express contract and a contract implied in fact is the manner in which the parties manifest their assent. 7 TENN. AM. JUR. 2D *Contracts* § 98 (1997). In an express contract, the parties assent to the terms of the contract by means of words, writings, or some other mode of expression. *See Computer Shoppe, Inc. v. State*, 780 S.W.2d 729, 735 (Tenn. Ct. App. 1989). In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract. *See Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997).

In contrast, contracts implied in law "are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice." *Id.* The Tennessee Supreme Court has recognized that contracts implied in law are also discussed in terms of unjust enrichment, quasi contract, and quantum meruit:

> ***Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same.*** Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto.

*Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966) (emphasis added); *see also Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (stating that

"[u]njust enrichment is a quasi-contractual theory under which a court may impose a contractual obligation on the parties where one does not otherwise exist"). In order to establish a claim based on this type of contract, the plaintiff must show that (1) a benefit has been conferred upon the defendant; (2) the defendant appreciated the benefit; and (3) acceptance of the benefit under the circumstances would make it inequitable for the defendant to retain the benefit without paying the value of the benefit. *Angus*, 968 S.W.2d at 808 (quoting ***Paschall's***, 407 S.W.2d at 155).

First, River Park argues that the trial court should have found that these parties had an express agreement, or at least an agreement implied in fact, for River Park to provide services to BlueCare enrollees at the hospital's standard rates. River Park asserts that such a contract was formed each time BlueCare gave an authorization number to its PCP, authorizing treatment at River Park. River Park points out that EMTALA requires the hospital to treat emergency patients, and BlueCare's contract with the State requires BlueCare to pay for those emergency services. *See* Contractor Risk Agreement ¶¶ 2-3.m.1, 2-3.w. River Park emphasizes that it told BlueCare on numerous occasions that it expected full payment for services rendered to BlueCare enrollees after January 1, 2000. Because BlueCare knew of this expectation, and because River Park never agreed to accept reduced rates, River Park claims that BlueCare either expressly or impliedly agreed to pay River Park its full, standard rates.

As noted above, both express contracts and contracts implied in fact require mutual assent of the parties. ***See Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n***, 807 S.W.2d, 559, 564 (Tenn. Ct. App. 1995). In this case, the parties engaged in months of negotiations and attended several meetings in an attempt to agree on a mutually acceptable reimbursement rate for treatment provided after January 1, 2000. On occasion, River Park offered to accept discounted rates of reimbursement under certain conditions; in fact, River Park's final offer included an agreement to accept BlueCare's in-network rates if BlueCare would agree to waive its utilization management procedures. BlueCare, however, never agreed to any of River Park's proposals. BlueCare repeatedly told River Park that it maintained a policy of not negotiating rates with individual hospitals, and that it intended to pay its own in-network rates for any services provided to BlueCare patients. The fact that BlueCare authorized its PCPs to attempt to admit patients to River Park is unavailing, because these admissions were for emergency patients and therefore were based on medical necessity. BlueCare's authorization of these admissions was not an implied agreement to pay River Park's standard rates. Under these circumstances, we cannot find that BlueCare either expressly or impliedly assented to pay River Park's standard rates for services provided to BlueCare enrollees. There being no mutual assent between the parties on this point, we affirm the trial court's determination that there was no express or implied agreement between the parties for the rate of reimbursement for emergency care provided to BlueCare enrollees after January 1, 2000. *See **Johnson***, 356 S.W.2d at 281.

We next address the finding that BlueCare was unjustly enriched. The trial court determined that "BlueCare has been unjustly enriched by River Park's provision of services to BlueCare enrollees. River Park is entitled to recover damages for this unjust enrichment in an amount to be determined in the damages phase of trial." It is apparent that a critical factor in the trial court's

decision was its revised finding that River Park sought recovery only for the "emergency" patients, which it was required to treat under EMTALA. The trial court emphasized this factor, stating more than once that "River Park had no choice but to provide these [emergency] patients with hospital services."[13] Other factors noted by the trial court were that: (1) six of the PCPs for BlueCare had admitting privileges only at River Park; (2) each time BlueCare authorized an admission to River Park, a River Park representative informed BlueCare that it expected full customary payment for any services provided; (3) though River Park gave BlueCare the opportunity, BlueCare did not instruct its PCPs to transfer the emergency patients to an in-network hospital; and (4) BlueCare disallowed all of River Park's claims when they were filed, requiring River Park to expend time and money in rebilling and appealing in order to obtain any payment, and that this pattern continued from the July 31 hearing to the November 27 hearing.

As noted above, the terms "unjust enrichment" and "contract implied in law" are used virtually interchangeably. *See Paschall's*, 407 S.W.2d at 154. In this case, both parties were required to deal with one another; neither had any choice. When presented with an emergency patient, either through the emergency room or through admission by a PCP, under the EMTALA, River Park has no choice except to treat the patient, regardless of whether the patient is a BlueCare enrollee. Likewise, under its risk agreement with the State, BlueCare is required to pay for emergency medical services for its enrollees, whether the services are provided by an in-network provider or by an out-of-network provider such as River Park. The Contractor Risk Agreement provides:

> The CONTRACTOR [BlueCare]'s plan shall include provisions governing utilization of any payment by the CONTRACTOR for emergency medical services received by an enrollee from non-contract providers . . . . Coverage of emergency medical services shall not be subject to prior authorization by the CONTRACTOR.

> * * *

> The Contractor shall be required to pay for all emergency medical services which are medically necessary until the clinical emergency is stabilized. This includes all medical services that may be necessary to assure, within reasonable medical probability, that no material deterioration of the patient's condition is likely to result from, or occur during, discharge of the patient or transfer of the patient to another facility.

---

[13]The trial court reiterated: "River Park only provides inpatient services to BlueCare enrollees when they present to River Park and River Park is informed that the admission is an emergent admission;" "River Park was informed in each [inpatient] case by the admitting PCPs that these inpatient admissions are emergency admissions;" "Under federal law, River Park cannot refuse the admission of any of these [in]patients, because both BlueCare and its PCPs have informed River Park that these admissions are emergent admissions;" and "By federal law River Park must provide these emergency services to any [emergency room] patient without regard to insurance until the patient is stabilized."

-14-

Thus, while neither of these parties may have wanted to deal with the other, both were left with no choice. Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is "dictated by reason and justice." *Angus*, 968 S.W.2d at 808. Thus, the trial court's finding of a contract implied in law, i.e., unjust enrichment, is affirmed.

Under these circumstances, the trial court must determine a reasonable rate of reimbursement for all of the emergency admissions at issue. River Park argues that it is entitled to its full standard rate because it repeatedly insisted on this rate with BlueCare. River Park's standard rate for its services is pertinent to the determination of a reasonable rate, but hardly conclusive. Likewise, BlueCare maintains that its reimbursement rate for in-network providers is clearly a reasonable rate, and relies heavily on its BlueCare provider services manual was well as on "industry custom" among MCOs of paying all providers, both in-network and out-of-network, the same rate. Again, evidence of BlueCare's in-network rates, as well as evidence of industry custom, is pertinent but certainly not determinative. In assessing a reasonable reimbursement rate, the trial court may take into account all of these factors, as well as others that may be pertinent, such as whether the rate for in-network providers is appropriate for out-of-network providers, given the difference in the volume of BlueCare enrollees treated. Moreover, the trial court may consider factors that increase the provider's costs, such as BlueCare's repeated automatic disallowance of claims previously authorized, apparently onerous and costly appeal and approval procedures, and delays in payment. Therefore, the cause must be remanded for a determination of a reasonable rate of reimbursement for River Park's provision of medical services to BlueCare enrollees who were "emergency" patients."[14]

River Park also argues that the trial court erred in dismissing its claims for conversion and its claims under the Tennessee Consumer Protection Act. With respect to the conversion claim, the trial court refused to allow River Park to amend its complaint to include a claim based on that theory of recovery. Nevertheless, in the order that is the subject of this appeal, the trial court rejected River Park's conversion claim, concluding that "no 'conversion' has taken place." Conversion is "the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (quoting *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965)). River Park argues that BlueCare converted its services to its own use when it refused to pay the full price for such services. Intangible services, however, are not subject to conversion under Tennessee law.[15] *See B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995). Therefore, we affirm the trial court's rejection of the claim of conversion. In addition, we affirm the trial court's rejection of River Park's Consumer Protection Act claim, because River Park did not adduce evidence that BlueCare engaged in "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a).

---

[14] We note that, as we held in this Opinion, the trial court may reconsider whether, based on the evidence presented, the 127 inpatients listed in Exhibit 31 should be included in the category of "emergency" patients.

[15] River Park alleges that "goods," along with the services, were also converted. However, it submitted no evidence that any such goods were involved in caring for the BlueCare enrollees, nor did it submit evidence of the value of any such goods. Therefore, we construe its claim as one for conversion of "services" only.

BlueCare argues that the trial court erred in rejecting its two counterclaims brought under the Consumer Protection Act, one for disparagement under Tennessee Code Annotated § 47-18-109(e)(1), and one for the recovery of attorney's fees as the prevailing party under Tennessee Code Annotated § 47-18-109(e)(1). BlueCare's claim for disparagement was based on letters sent to three obstetricians, stating that BlueCare was unresponsive to River Park's needs, that it was "pushing patients to other counties for their care," and that BlueCare's efforts to move obstetrics patients to in-network hospitals "shows Blue Cross's lack of concern for the healthcare needs of our patients in Warren County." Tennessee Code Annotated § 47-18-104(b) prohibits "disparaging the goods, services or business of another by false or misleading representations of fact." The trial court held that the comments made in the letters were opinions and, thus, did not constitute "false or misleading representations of fact." We agree, and affirm the trial court's rejection of this claim. We also affirm the trial court's rejection of BlueCare's claim for attorney's fees as a prevailing party, because it was not the prevailing party in its own Consumer Protection Act claim, and, although it prevailed as to River Park's claim under the Act, River Park's claim was not without a legitimate basis.

Finally, we affirm the trial court's denial of discretionary costs to BlueCare under Tennessee Rule of Civil Procedure 54.04(2). This holding does not prevent BlueCare from raising this issue again at the conclusion of the trial below.

In sum, we find that any error by the trial court in reopening the proof was harmless. We find that Rule 1200-13-12-.08 establishes a floor for reimbursement rates for non-contract providers, but does not establish a ceiling. We affirm the trial court's finding that there was neither an express contract nor a contract implied in fact between the parties. We affirm the trial court's finding of a contract implied in law between the parties, and remand for the trial court to determine a reasonable rate of reimbursement for services provided by River Park during the pertinent time period to emergency patients who were BlueCare enrollees. The trial court may also consider whether all of the patients for whom River Park seeks reimbursement were "emergency" patients. We affirm the trial court's dismissal of River Park's claim under the Tennessee Consumer Protection Act and the rejection of River Park's claim of conversion. We affirm the trial court's dismissal of BlueCare's claim of disparagement and its claims for attorney's fees, as well as the denial of discretionary costs. All remaining issues on appeal are pretermitted. This cause is remanded for a determination of damages.

The decision of the trial court is affirmed and remanded for further proceedings not inconsistent with this Opinion. Costs of this appeal are taxed equally to the appellants, BlueCross BlueShield of Tennessee, Inc. and Volunteer State Health Plan, Inc., d/b/a Blue Care, and their surety and the appellee, River Park Hospital, for which execution may issue, if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE