IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2024 Session

FILED
05/21/2025
Clerk of the
Appellate Courts

## THE CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY D/B/A ERLANGER HEALTH SYSTEM v. DIVISION OF TENNCARE, DEPARTMENT OF FINANCE AND ADMINISTRATION, ET AL.

Appeal from the Chancery Court for Davidson County
No. 18-926-II     Anne C. Martin, Chancellor

---

### No. M2023-01619-COA-R3-CV

---

A hospital system filed a declaratory judgment action in the Davidson County Chancery Court seeking invalidation of two TennCare State Plan Amendments on the basis that they violate Tennessee Code Annotated section 71-5-108. The two State Plan Amendments set forth reimbursement rates for emergency services provided to Tennessee's Medicaid beneficiaries when the provider of those emergency services does not have a contract with the managed care organizations that insure the beneficiaries. The Davidson County Chancery Court declared that the TennCare State Plan Amendments were invalid and void *ab initio*. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; Reed N. Smith, Assistant Attorney General; and Meredith Wood Bowen, Senior Assistant Attorney General, for the appellants, Division of TennCare, Department of Finance and Administration; Stephen Smith, in his official capacity as Director of TennCare; and Jim Bryson, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration.

Steven Allen Riley, Gregory S. Reynolds, James Nathaniel Bowen, II, Joshua S. Bolian, and Grace Cooley Peck, Nashville, Tennessee, for the appellee, The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System.

# OPINION

## I.     BACKGROUND

Plaintiff-Appellee, The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger"), is a not-for-profit tertiary care hospital system headquartered in Chattanooga, Tennessee.  Erlanger is a teaching hospital and operates a Level I trauma center.

In 1965, federal legislation established Medicaid, a federal-state program that provides federal funding for medical and health-related services to individuals of limited financial resources.  The federal government shares the costs of Medicaid with a participating state, subject to federal requirements.  TennCare is the State of Tennessee's Medicaid program, and federal funding pays for approximately two-thirds of the program's expenses.  TennCare maintains a "State plan" which is "a comprehensive written statement submitted by the agency describing the nature and scope of [the state's] Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of [applicable federal law]."  42 C.F.R. § 430.10.[1]  "Medicaid agency or agency means the single State agency administering or supervising the administration of a State Medicaid plan."  42 C.F.R. § 400.203.  The Tennessee Department of Finance and Administration's Division of TennCare is the state agency tasked with administering the TennCare program and is one of the Defendants-Appellants in this litigation.

The original 1960s Medicaid model was fee-for-service.  In a fee-for-service model, a state's Medicaid program pays health care providers directly for services given to eligible individuals.  The state establishes the reimbursement rates for services provided to Medicaid enrollees.  *See River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 48 (Tenn. Ct. App. 2002).  This is how Tennessee's Medicaid program operated before 1994.  States may obtain waivers of State Plan requirements.  *See* 42 U.S.C. § 1315(a) (allowing federal government to waive requirements).  The modern TennCare program was established in 1994 and implemented through a demonstration project waiver proposed by Tennessee's governor and approved by the federal government.  The waiver has been renewed several times.  Despite the waiver, Tennessee, through TennCare, formally maintains a State Plan.

Since 1994, TennCare has operated the program as a managed care model.  As such, the State and private insurance companies known as managed care organizations ("MCOs") are contractually bound by contractor risk agreements.  *River Park*, 173 S.W.3d at 48.  Under the risk agreements, the State pays an MCO a monthly payment known as a

---

[1] Sources cited throughout this Opinion use the terms "State plan," "state plan," and "State Plan" interchangeably.

"capitation payment" for each eligible individual enrolled with that MCO. *Id*. In turn, the MCO arranges for the provision of health care services to eligible TennCare recipients who choose to enroll with that MCO. *Chattanooga-Hamilton Cnty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc*., 475 S.W.3d 746, 749 (Tenn. 2015) ("*UnitedHealthcare*").

The MCOs develop a network of "in-network providers" or "participating providers," such as doctors and hospitals, who render medical services at rates negotiated between the MCO and the provider. These rates are confidential. "An MCO will generally aim to reduce costs by negotiating with the healthcare providers in its network to accept discounted rates for the services provided to the MCO's enrollees." *Id.* at 750. If the MCO pays more to providers than it receives in capitation payments from TennCare, the MCO, not TennCare, bears the loss. *River Park*, 173 S.W.3d at 48. Providers that do not have a contract with an MCO but nevertheless provide services to the MCO's enrollees are referred to as "non-participating" or "non-contract" providers. *UnitedHealthcare*, 475 S.W.3d at 750. Alternatively, they are referred to as "out-of-network providers." *Emergency Med. Care Facilities, P.C. v. Div. of TennCare*, 671 S.W.3d 507, 511 (Tenn. 2023).

Pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), a hospital such as Erlanger must treat someone experiencing an emergency medical condition until the condition has stabilized and regardless of that person's insurance status or ability to pay. From January 1, 2009, through February 28, 2015, Erlanger was out-of-network with a large TennCare MCO named UnitedHealthcare Plan of the River Valley, Inc. d/b/a AmeriChoice. During this period, Erlanger continued to provide the services required by EMTALA to AmeriChoice enrollees even though there was no contract specifying how AmeriChoice would pay Erlanger. EMTALA itself did not set reimbursement rates for out-of-network hospitals that provide EMTALA-required services to Medicaid enrollees.

In 2005, Congress enacted the Deficit Reduction Act of 2005 which, among other things, established a limit on the amount that Medicaid MCOs could pay non-contract providers for emergency services:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an

entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6085(a), 120 Stat. 4, 121 (2006) (codified at 42 U.S.C. § 1396u-2(b)(2)(D)) (the "Federal DRA"). The Federal DRA took effect on January 1, 2007. *Id.* § 6085(b).

Because it was a managed care model, TennCare did not have fee-for-service rates when the Federal DRA took effect.[2] Rather, its "State Plan" contained an inpatient per diem for services and did not set a rate specifically for inpatient emergency services. At the time the Federal DRA was enacted, there existed a TennCare rule requiring that for emergency services provided to a TennCare enrollee by an out-of-network provider, the MCO "shall reimburse the provider at the rate of 100% of the lowest rate paid to the [MCO's] network providers." Tenn. Comp. R. & Regs. 1200-13-13-.08(2) (2005). As detailed below, this rule was eventually replaced with the two TennCare rules regulating payment by MCOs that are at issue in the companion appeal, *The Chattanooga-Hamilton County Hospital Authority v. Division of TennCare, et al.*, No. M2023-01350-COA-R3-CV. The Federal DRA prompted TennCare to issue memoranda in February and March of 2007 seeking input from TennCare stakeholders about amending the State Plan and complying with the Federal DRA.

In April 2007, the Tennessee Hospital Association proposed a draft bill to the Tennessee General Assembly with the following language:

Hospitals that do not have in effect a contract with a managed care entity that establishes payment amounts for services furnished to TennCare enrollees shall be paid for emergency services the average contract rate that would apply for general acute care hospitals.

TennCare advised the General Assembly that, as written, the bill would increase State expenditures by over three million dollars and would increase federal expenditures by over five million dollars. TennCare and the Tennessee Hospital Association negotiated changes to the draft bill. Proposed amendments were reviewed in the General Assembly, including by the Fiscal Review Committee. Ultimately, the General Assembly enacted Tennessee Code Annotated section 71-5-108, entitled "State plan amendment; payment methodology." This statute, referred to in this litigation as the "State DRA," provides:

---

[2] Again, in Tennessee, the State makes capitation payments to MCOs rather than paying providers.

The TennCare bureau is directed to submit a state plan amendment to the centers for medicare and medicaid services that sets out a payment methodology for medicaid enrollees who are not also enrolled in medicare, consistent with provisions in § 6085 of the federal Deficit Reduction Act of 2005, regarding emergency services furnished by noncontract providers for managed care enrollees. The payment amount shall be the average contract rate that would apply under the state plan for general acute care hospitals. A tiered grouping of hospitals by size or services may be utilized to administer these payments. The payment methodology developed pursuant to this section shall be budget neutral for the state fiscal year 2007–2008 when compared to the actual experience for emergency services furnished by non-contract providers for medicaid managed care enrollees prior to January 1, 2007. It is the intent that this section only applies to the emergency services furnished by non-contract providers for medicaid managed care enrollees.

Tenn. Code Ann. § 71-5-108. The statute took effect on June 11, 2007, and has not been amended since.

Pursuant to the State DRA's directive, TennCare submitted to the Centers for Medicare and Medicaid Services ("CMS") a state plan amendment ("SPA").[3] TennCare proposed its amendment in September 2007, and it was assigned tracking number 07-003. The language of proposed SPA 07-003 reflected the rule that was in place at that time, *i.e.*, it would have required MCOs to pay out-of-network hospitals "one hundred percent (100%) of the lowest contracted rate for emergency services provided at in-network general acute care hospitals." CMS rejected proposed SPA 07-003. CMS advised that the "language that indicates the rates to be paid for emergency services will be the lowest contracted rates for emergency services provided to in-network general acute care hospitals" was "not comprehensive enough to determine how the rates will be determined and must be amended to provide this level of detail." CMS further indicated that the amendment "must be comprehensive enough to determine the required level of [Federal Financial Participation] and to allow interested parties to understand the rate setting process and the items and services that are paid through these rates." CMS also advised that the rate should not be included in Section 4.19-A of the State Plan, which provides methods for establishing payment rates for inpatient hospital services, and instead it should be included in Section 4.19-B, which pertains to outpatient services. Based on such feedback, TennCare withdrew SPA 07-003.

---

[3] "CMS, previously known as the Health Care Financing Administration, is a federal agency within the Department of Health and Human Services that works in partnership with state governments to administer the Medicaid program and other programs." *UnitedHealthcare*, 475 S.W.3d at 751 n.7.

Then, TennCare submitted SPA 08-003 to CMS. TennCare reclassified the amendment under the outpatient portion of the State plan. To get to the payment methodology, TennCare's Chief Financial Officer requested information about the lowest in-network contract rate for five CPT codes[4] associated with outpatient emergency services from TennCare's three largest health plans. He then converted the average of those rates to a percentage of federal Medicare rates, which are available to the public. This resulted in the payment methodology of 74% of the 2006 Medicare rates for those services. In its responses to interrogatories, TennCare explained:

> The 74% rate establishes a payment amount that equates, as a percentage of 2006 Medicare rates, to the approximate average of the lowest contract rate that TennCare [MCOs] paid in-network providers for providing outpatient emergency services under [certain CPT codes].

TennCare placed notices about the pending change in the newspaper but did not go through the rulemaking process set forth in the Uniform Administrative Procedures Act ("UAPA"). The newspaper notice stated, "The plan amendment is being submitted to comply with Section 6085 of the Deficit Reduction Act of 2005." CMS approved SPA 08-003. It was effective as of February 1, 2008 and states:

> Covered medically necessary emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act [*i.e.*, the Federal DRA], shall be reimbursed at 74 percent of the 2006 Medicare rates for those services. This methodology does not apply to Medicare crossover claims, which are paid in accordance with Attachment 4.19B, Section 24.

TennCare sought to promulgate a rule reflecting the above 74% payment methodology. TennCare filed a notice of rulemaking hearing with the Secretary of State. TennCare failed to cite the State DRA in the rulemaking forms it filed with the Secretary of State. On September 15, 2008, TennCare published notice of the proposed rule in the Tennessee Administrative Register. On October 16, 2008, TennCare conducted a rulemaking hearing as required by the UAPA. No interested parties besides TennCare representatives attended. TennCare did not receive any comments related to the proposed 74% rule. The Tennessee Attorney General approved the proposed rule. TennCare filed the proposed rule with the Secretary of State. On April 27, 2009, the Government

---

[4] A CPT (Current Procedural Terminology) code is a five-digit code used for billing and administrative purposes by providers to report medical procedures, services, and tests performed on patients.

Operations Committee reviewed the proposed rule and approved it with a positive recommendation. As codified, the rule reflecting the 74% payment methodology in SPA 08-003 provides:

> Covered medically necessary outpatient emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act (42 U.S.C.A. § 1396u-2(b)(2)(D)), shall be reimbursed at seventy-four percent (74%) of the 2006 Medicare rates for these services. Emergency care to enrollees shall not require preauthorization.

Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(b) (the "74% Rule"). The 74% Rule took effect on May 11, 2009, and has not been amended since.

Thereafter, TennCare submitted to CMS SPA 10-003 concerning inpatient hospital admissions required as a result of emergency outpatient services. As it did before with SPA 08-003, TennCare requested its MCOs to provide the lowest in-network rate for inpatient services and calculated an average of the amounts received. TennCare then converted this average to a percentage of Medicare rates, resulting in a payment methodology for out-of-network inpatient admissions resulting from outpatient emergency services of 57% of 2008 Medicare rates. TennCare explained, "The 57% rate establishes a payment amount that equates, as a percentage of 2008 Medicare rates, to the approximate weighted average of the lowest contract rates that TennCare MCOs paid in-network providers for providing applicable inpatient services in or around 2010." Again, TennCare placed notices about the pending change in the newspaper but did not go through the rulemaking process set forth in the UAPA. CMS approved SPA 10-003. It was effective as of March 17, 2010, and states:

> Covered medically necessary admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act, shall be reimbursed at 57 percent of the 2008 Medicare Diagnostic Related Groups (DRG) rates determined in accordance with 42 CFR 412 for those services. For DRG codes that are adopted after 2008, 57% of the rate from the year of adoption will apply. These inpatient stays will continue until they are no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first. This methodology does not apply to Medicare crossover claims, which are paid in accordance with Attachment 4.19B, Section 24.

TennCare sought to promulgate a rule reflecting the above 57% payment methodology. TennCare filed a notice of rulemaking hearing and went through emergency rulemaking.[5] It held the required public hearing for the proposed 57% rule on October 21, 2010. No one besides TennCare representatives attended. The Tennessee Attorney General approved the rule. TennCare filed the rule with the Secretary of State. TennCare failed to cite the State DRA in the rulemaking forms it filed with the Secretary of State. On March 28, 2011, the Government Operations Committee reviewed the proposed rule. TennCare's former Chief Medical Officer, Dr. Long, testified "to pay more [than the 57% rate], we would have to have an appropriation [from the General Assembly]. There would be a cost associated with paying more than we've ever paid since the inception of TennCare." The Government Operations Committee voted to disallow the rule, which allowed it to go into effect, but only until the vote on the rules omnibus bill. This option was intended to allow TennCare to proceed and to give the General Assembly a chance to appropriate necessary funds to do something different than the 57% rule. The General Assembly did not appropriate additional funds related to it. As codified, the rule reflecting the 57% payment methodology in SPA 10-003 provides:

> Covered medically necessary inpatient hospital admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act (42 U.S.C.A. § 1396u-2(b)(2)(B)), shall be reimbursed at 57 percent of the 2008 Medicare Diagnostic Related Groups (DRG) rates (excluding Medical Education and Disproportionate Share components) determined in accordance with 42 C.F.R. § 412 for those services. For DRG codes that are adopted after 2008, 57 percent of the rate from the year of adoption will apply. Such an inpatient stay will continue until no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first.

Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(c) (the "57% Rule"). The permanent 57% Rule took effect on March 29, 2011, and has not been amended since.

Again, from January 1, 2009, through February 28, 2015, Erlanger was out-of-network with AmeriChoice, a large TennCare MCO. A dispute arose about the rates AmeriChoice was required to pay Erlanger for the out-of-network, EMTALA-mandated

---

[5] The UAPA "gives agencies authority to promulgate emergency rules in certain enumerated circumstances. *See* Tenn. Code Ann. § 4-5-208. Emergency rules 'become effective immediately' but lapse after 180 days. *Id*. § 4-5-208(b). To make the rule permanent, the agency must promulgate the rule through ordinary rulemaking procedures. *See id*." *Emergency Med.*, 671 S.W.3d at 511 n.2.

services Erlanger was providing to AmeriChoice enrollees. In June 2009, Erlanger sued AmeriChoice in the Chancery Court for Davidson County ("trial court"). *UnitedHealthcare*, 475 S.W.3d at 753. Citing the State DRA, Erlanger "alleged that AmeriChoice was obligated to pay at least the 'average contract rate' payable for EMTALA-mandated services." *Id.* AmeriChoice answered that it had paid Erlanger all that was due under TennCare regulations (the 74% Rule and the 57% Rule). AmeriChoice also asserted that Erlanger's complaint, "in effect, challenged the applicability and/or validity of" the TennCare regulations. *Id.* Upon review, the Tennessee Supreme Court reasoned:

> Erlanger's request for a ruling that it is entitled to 'the average contract rate' under the [State] DRA or Section 71-5-108 is in effect a request for a ruling that the TennCare Rules are invalid or inapplicable because they are inconsistent with the statutes. This triggers the UAPA's requirement of exhaustion of administrative remedies.

*Id.* at 757. The Supreme Court held that Erlanger was required to exhaust its administrative remedies with TennCare before the courts could resolve Erlanger's dispute with AmeriChoice. *See id.* at 766.

To initiate the administrative proceedings, in April 2017, Erlanger petitioned TennCare for a "declaratory order and declaratory judgment" that the 74% Rule and the 57% Rule violate the State DRA "to the extent those Rules purport to establish the maximum compensation rate for out-of-network providers who provide services required by EMTALA."[6]

On December 11, 2017, TennCare's designated Tennessee Rule of Civil Procedure 30.02(6) representative testified:

> Q. Instead of amending the state plan to provide rates for out-of-network providers of emergency care, rates that would approximate the average contract rate paid to in-network providers for those same services, TennCare chose to do something different, didn't it?
>
> A. Yes.

---

[6] "Any affected person may petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency." Tenn. Code Ann. § 4-5-223(a).

Q. And what TennCare chose to do was to provide a specific rate that was static and would never increase, right?

A. Correct.

Q. And that static rate that TennCare chose to impose ensured that at most out-of-network providers of emergency care in Tennessee would receive the lowest contract rates paid to in-network providers for those same services, correct?

A. Correct.

On January 9, 2018, Erlanger filed an amended petition for a declaratory order before TennCare. The amended petition again sought a declaration that the 74% Rule and the 57% Rule were invalid because they failed to comply with the State DRA in that "the payment amounts established under the Rules do not equal 'the average contract rate that would apply under the state plan for general acute care hospitals.'"

Additionally, Erlanger's amended petition requested a declaration that SPAs 08-003 and 10-003 violated the State DRA and sought an order requiring TennCare to amend its State Plan to conform to the State DRA. The parties spent the spring and summer of 2018 litigating TennCare's motion to dismiss the SPA-related declaratory relief sought by Erlanger in its amended petition. Ultimately, by order entered July 3, 2018, TennCare's Commissioner's Designee determined that TennCare lacked primary jurisdiction because SPA 08-003 and SPA 10-003 did not meet the definition of a statute, rule or order under the UAPA. Therefore, the Commissioner's Designee decided that the SPAs were not subject to challenge under Tennessee Code Annotated section 4-5-223(a). TennCare dismissed Erlanger's petition insofar as it pertained to the SPAs.

Erlanger's challenge to the Rules worked its way through the administrative proceedings. By declaratory order entered September 20, 2021, TennCare's Commissioner's Designee found that the State DRA was ambiguous, concluded that the 74% Rule and the 57% Rule do not violate the State DRA, and denied Erlanger's amended petition to the extent it pertained to the Rules. Pursuant to Tennessee Code Annotated sections 4-5-223 and 4-5-322, on November 12, 2021, Erlanger petitioned the trial court for judicial review and reversal of the Commissioner's Designee's declaratory order.[7] The parties submitted briefs and the trial court heard arguments on July 13, 2023. By order entered August 24, 2023, the trial court reversed the Commissioner's Designee's decision

---

[7] "Venue for appeals of contested case hearings involving TennCare determinations shall be in the chancery court of Davidson County." Tenn. Code Ann. § 4-5-322(b)(1)(A)(iii).

and held that the 74% Rule and the 57% Rule were "invalid and void *ab initio*" for two reasons. First, the trial court found the State DRA to be "clear and unambiguous." The court reasoned, "using the natural and ordinary meaning of the words, the State DRA requires the 'average contract rate,' while [SPA 08-003 and SPA 10-003] and [the] corresponding Rules are based on an 'arithmetic average' of the *lowest* in-network rates from the MCOs. Thus, the Rules violate the State DRA." Second, the court found that by failing to cite the State DRA in its submissions to the Secretary of State, TennCare failed to follow the procedure required by the UAPA, rendering the 74% Rule and the 57% Rule void and of no effect. We address TennCare's appeal from that order in our Opinion rendered in *The Chattanooga-Hamilton County Hospital Authority v. Division of TennCare, et al.*, No. M2023-01350-COA-R3-CV.

Meanwhile, Erlanger carried on with its challenge to the SPAs. TennCare had refused to issue a declaratory order as to the SPAs, so pursuant to Tennessee Code Annotated section 4-5-225, on August 24, 2018, Erlanger filed the declaratory judgment action underlying this appeal in the trial court.[8] In counts one and two of its complaint, Erlanger sought declarations that SPA 08-003 and 10-003 were "invalid, unenforceable, unlawful, and unconstitutional" for lack of compliance with the State DRA. Erlanger also sought certain injunctive relief in count three.

Erlanger moved for partial summary judgment on its declaratory relief claims. TennCare sought summary judgment dismissal of all claims. The trial court stayed the action pending resolution of Erlanger's petition challenging the Rules. On August 24,

---

[8] Section 4-5-225 provides:

(a) The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant. The agency shall be made a party to the suit.

(b) A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order.

(c) In passing on the legal validity of a rule or order, the court shall declare the rule or order invalid only if it finds that it violates constitutional provisions, exceeds the statutory authority of the agency, was adopted without compliance with the rulemaking procedures provided for in this chapter or otherwise violates state or federal law.

Tenn. Code Ann. § 4-5-225.

2023, the trial court denied TennCare's motion for summary judgment and entered partial summary judgment in Erlanger's favor. The trial court held that SPAs 08-003 and 10-003 violated the "clear and unambiguous" State DRA language which "requires the 'average contract rate,' while the SPAs are based on an 'arithmetic average' of the *lowest* in-network rates from the MCOs." Additionally, the trial court held that the SPAs fall within the UAPA's definition of "rule" and were, therefore, subject to its procedural rulemaking requirements, which TennCare did not follow. The court found that TennCare's subsequent promulgation of the 74% and 57% Rules adopting the payment methodology in the SPAs did not cure any procedural defect because "the Rules are agency statements separate from the SPAs." The trial court declared SPAs 08-003 and 10-003 invalid and void *ab initio*.

The August 24, 2023, order stayed Erlanger's request for injunctive relief pending resolution of all appeals in this case and in *The Chattanooga-Hamilton County Hospital Authority v. Division of TennCare, et al.*, No. M2023-01350-COA-R3-CV. On November 2, 2023, the August 24 order was certified as a final judgment pursuant to Tennessee Rule of Civil Procedure 54.02. TennCare appealed.

## II. ISSUES

Appellants raise the following issues for review:

A. Whether Erlanger's challenge to the validity of SPA 08-003 and SPA 10-003 is foreclosed on federal preemption grounds, given that federal law requires SPAs and the federal government approved the payment methodologies set forth in the SPAs.

B. Alternatively, whether SPA 08-003 and SPA 10-003 are valid because they comply with [the State DRA].

C. Whether SPA 08-003 and SPA 10-003 are valid because they are cost-cutting measures that TennCare has plenary authority to implement.

D. Whether SPA 08-003 and SPA 10-003 are valid notwithstanding the rulemaking requirements of the UAPA because SPAs are not subject to such rulemaking requirements or because they satisfy such requirements through subsequent rulemaking.

### III.    STANDARD OF REVIEW

We review issues of statutory construction de novo with no presumption of correctness attaching to the trial court's rulings. *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009).

"[T]his Court reviews a trial court's decision in a declaratory judgment action filed pursuant to section 4-5-225 using the standard of review generally applicable to civil cases set forth in Tennessee Rule of Appellate Procedure 13(d)." *Calfee v. Tennessee Dep't of Transp.*, No. M2016-01902-COA-R3-CV, 2017 WL 2954687, at *4 n.5 (Tenn. Ct. App. July 11, 2017). We review a non-jury case de novo upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting Tenn. R. Civ. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." Tenn. R. Civ. P. 56.06.

In reviewing a summary judgment motion on appeal, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 596 S.W.3d 726, 733 (Tenn. Ct. App. 2019) (citations and quotations omitted). Appellate review of a trial court's ruling granting a motion for summary judgment is de novo, with no presumption of correctness. *Rye*, 477 S.W.3d at 250 (citation omitted). Under the de novo standard of review, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* (citation omitted).

## IV.    DISCUSSION

### A.

First, TennCare argues that Erlanger's challenge to the validity of SPA 08-003 and 10-003 is foreclosed by federal preemption.  TennCare contends that preemption applies because federal law requires TennCare to pay based on the CMS-approved rates, *i.e.*, the rates set forth in the SPAs.  Erlanger commenced this action essentially alleging that because TennCare failed to comply with a *state* statute its actions were *ultra vires*.

Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land. . . ." U.S. Const. art. VI, cl. 2.  Generally, "the States possess sovereignty within their particular spheres concurrent with the federal government subject only to the power of the Congress under the Supremacy Clause of the United States Constitution to preempt state law." *Pendleton v. Mills*, 73 S.W.3d 115, 126 (Tenn. Ct. App. 2001) (citing *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990); *BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 670 (Tenn. Ct. App. 1997)).  Consistent with this principle, a federal law or regulation may preempt a state claim. *See Lake v. Memphis Landsmen, LLC*, 405 S.W.3d 47, 55 (Tenn. 2013).  Courts recognize both express and implied preemption, but "no matter what type of preemption is at issue, 'the purpose of Congress is the ultimate touchstone.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  "In cases involving express preemption, the text of the federal statute will define the domain that Congress intended to preempt." *Pendleton*, 73 S.W.3d at 127 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)).  Courts are "reluctant to presume" that the state's powers in matters traditionally subject to its authority "are . . . displaced by a federal statute unless that is the clear and manifest intent of Congress." *Id.* at 126.  Whether federal law preempts a state statute or common law cause of action is a question of law that we review de novo. *Lake*, 405 S.W.3d at 55.

Federal law contemplates that states will design and administer their Medicaid programs within broad federal requirements and coverage mandates.  Federal law obligates TennCare to pay for medical services "using rates determined in accordance with methods and standards specified in an approved State plan." *See* 42 C.F.R. §§ 447.253(i), 447.200.  TennCare argues that the payment methodologies in SPA 08-003 and SPA 10-003 were submitted to and approved by CMS.  TennCare contends that SPA approvals by CMS are an exercise of federal rulemaking authority and have the force and effect of federal law, thus preempting any state law to the contrary, such as the State DRA.  In TennCare's view, because federal law requires TennCare to pay based on the CMS-approved rates, *i.e.*, the rates set in both SPAs, it matters not if the State DRA requires a different rate.   TennCare

presses that it "simply cannot, without CMS approval, pay a different rate." In essence, TennCare argues that CMS's approval of SPA 08-003 and SPA 10-003 ratified the payment rates in federal law notwithstanding the fact that—as detailed below—the rates violate the payment methodology required by the State DRA under which TennCare purportedly acted in setting those rates.

We disagree. First, we note that TennCare's argument is not that the Federal DRA preempts the State DRA. Rather, TennCare argues that CMS's approval of the two SPAs preempts the State DRA if "the State DRA compels a different rate" than the rates set forth in the SPAs. TennCare seems to reason that the approval by CMS made the two SPAs part of the State Plan and that, in order to receive federal Medicaid funding, states must abide by their State Plans. However, the fact that the payment methodologies set forth in SPAs for which TennCare sought CMS approval violate the State DRA undermines, rather than supports, the federal approval on which TennCare relies. Stretched to its limit, TennCare's argument would allow it to set any payment rate it desired, even one in contravention of a State statute, so long as CMS eventually approved.

CMS may only approve SPAs proposed to it by a state, and CMS has no authority to change State plans on its own. A State plan is a "written statement submitted *by the agency*," 42 C.F.R. § 430.10 (emphasis added), and "the agency" means the state Medicaid agency. *Id.* at § 400.203. CMS reviews State plans and State plan amendments and may approve or disapprove them. *See* 42 C.F.R. §§ 430.14–430.16. Moreover, State plans must be amended to reflect "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1)(ii). It follows that State plans and State plan amendments must comport with State law and that CMS approval does not prevent a state from changing its laws or policies related to its Medicaid program. Further, a state agency acts on behalf of Tennessee only when it is acting within its statutory authority. *See* Tenn. Code Ann. § 4-5-103(a)(2) ("Administrative agencies shall have no inherent or common law powers, and shall only exercise the powers conferred on them by statute or by the federal or state constitutions."). As explained below, the rates set out in SPA 08-003 and SPA 10-003 were different than what is mandated by the State DRA, which means that TennCare did not have authority to propose such rates to CMS. With the foregoing considerations in mind, we conclude that CMS's approval of SPA 08-003 and SPA 10-003 does not preempt Erlanger from challenging their validity under the State DRA.

B.

Determining whether SPA 08-003 and 10-003 violate the State DRA requires interpretation of that statute:

- 15 -

The TennCare bureau is directed to submit a state plan amendment to the centers for medicare and medicaid services that sets out a payment methodology for medicaid enrollees who are not also enrolled in medicare, consistent with provisions in § 6085 of the federal Deficit Reduction Act of 2005, regarding emergency services furnished by noncontract providers for managed care enrollees. The payment amount shall be the average contract rate that would apply under the state plan for general acute care hospitals. A tiered grouping of hospitals by size or services may be utilized to administer these payments. The payment methodology developed pursuant to this section shall be budget neutral for the state fiscal year 2007-2008 when compared to the actual experience for emergency services furnished by non-contract providers for medicaid managed care enrollees prior to January 1, 2007. It is the intent that this section only applies to the emergency services furnished by noncontract providers for medicaid managed care enrollees.

Tenn. Code Ann. § 71-5-108. Statutory construction is a question of law that is reviewed de novo with no presumption of correctness. *Thurmond v. Mid-Cumberland Infectious Disease Consultants, PLC*, 433 S.W.3d 512, 516–17 (Tenn. 2014). The Tennessee Supreme Court has provided:

When interpreting a statute, our role is to ascertain and effectuate the legislature's intent. We must not broaden or restrict a statute's intended meaning. We also presume that the legislature intended to give each word of the statute its full effect. When statutory language is unambiguous, we accord the language its plain meaning and ordinary usage. Where the statutory language is ambiguous, however, we consider the overall statutory scheme, the legislative history, and other sources.

*Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc*., 418 S.W.3d 547, 553 (Tenn. 2013).

Erlanger has always maintained that TennCare's actions differed from the direction provided in the State DRA because TennCare's SPAs directed payment to out-of-network providers at the lowest in-network rates, not the average contract rates. In examining the statute's plain language, we see that it unambiguously requires the "average contract rate." Tenn. Code Ann. § 71-5-108. On appeal, TennCare asserts that the contractor risk agreements between the State and MCOs "are the contracts that provide the rates 'that would apply under the State Plan.'" We disagree because the record, the State DRA's language, and the Federal DRA's language, show that the rates to use in determining the average contract rate are those in the contracts between the MCOs and providers. Such

rates are those that "would apply" if the "noncontract [*i.e.*, out-of-network] providers," who are the subjects addressed in the statute, were in-network. *Id*. Indeed, it is undisputed in the record that TennCare crafted the payment methodologies by first asking its MCOs for the rates paid to providers for emergency services, albeit the lowest rates. As the trial court cogently explained, the State DRA points to the use of provider contract rates through the phrase "that would apply under the state plan." We agree with the trial court's reasoning that this phrase reflects the General Assembly's awareness at the time that the official State Plan document did not have contract rates for emergency services and mostly had been supplanted by the TennCare demonstration project waiver. So, the State DRA's reference to the "rate that would apply under the state plan for general acute care hospitals" means the rate set forth in the contracts between MCOs and in-network general acute care hospitals which "would apply" but for the TennCare waiver. The Federal DRA's language confirms this interpretation.[9] The language "average contract rate that would apply under the state plan for general acute care hospitals" appears in both statutes, but is given additional context in the Federal DRA:

> *In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released*, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

42 U.S.C. § 1396u-2(b)(2)(D) (emphasis added). The word "contract" in the Federal DRA appears within the phrase "negotiated by contract and not publicly released" which refers to the contracts that MCOs and providers negotiate between themselves. *See, e.g.*, *River Park*, 173 S.W.3d at 48–49 (describing negotiations between an MCO and a provider).

The record contains no genuine issue of material fact and confirms that the payment methodologies in the two SPAs were based on an average of the *lowest* contract rates that TennCare MCOs paid in-network providers of emergency services. This was in violation of the State DRA which mandates payment at the average contract rate. In his deposition, TennCare's representative agreed that TennCare "chose to do something different" than "amending the state plan to provide rates for out-of-network providers of emergency care, rates that would approximate the average contract rate paid to in-network providers for those same services." Because the payment methodologies fixed in SPA 08-003 and SPA 10-003 violate the State DRA, we affirm the trial court's order declaring them invalid and void *ab initio*.

---

[9] The State DRA requires the payment methodology to be "consistent with provisions in" the Federal DRA. *Id*.

C.

TennCare next argues that SPA 08-003 and SPA 10-003 are cost-cutting measures which fall under its broad statutory authority to control costs of the TennCare program under Tennessee Code Annotated section 71-5-102(d):

> The bureau of TennCare shall have the authority to develop and implement initiatives or program modifications to control the costs of the TennCare program to the extent permitted under federal law and the TennCare waiver. Such cost-saving measures may include, but are not limited to, the elimination of covered benefits or limitations on the scope, intensity, or duration of such benefits; implementation of cost sharing requirements for enrollees, including the medicaid population; increases in cost sharing requirements for the expansion population; enforcement of cost sharing requirements through denial of service for failure to meet co-payment requirements with alternative access to medically necessary care through established safety net providers; enforcement of collection of required co-payments by providers; reassignment of enrollees into different eligibility categories; restrictions on eligibility for non-mandatory medicaid or waiver expansion categories; and the elimination from TennCare eligibility of some or all of the non-mandatory medicaid or waiver expansion categories. The bureau of TennCare may implement a premium-assistance initiative for persons disenrolled from TennCare. The bureau of TennCare shall also be authorized, in establishing or modifying benefits or cost sharing requirements, to define, through rules and regulations, categories of eligible enrollees who may be exempted from some or all benefit limits or cost sharing requirements, along with any requirements that must be met by such enrollees to prove or maintain exempted status. The bureau of TennCare shall have all such authority to control costs notwithstanding any other state law to the contrary.

Tenn. Code Ann. § 71-5-102(d).

The trial court found that the State DRA did not conflict with the cost-control authority granted by section 71-5-102(d), that the two statutes were not mutually exclusive, and that TennCare was not prevented "from complying with the mandates of the State DRA despite its authority to implement cost-control measures." Upon de novo review, we agree with the trial court's conclusion. Section 102(d) authorizes TennCare to pursue general cost-control initiatives for its program. The State DRA does not contradict that

authorization but merely establishes what "[t]he payment amount shall be" for certain services. Tenn. Code Ann. § 71-5-108.

The Tennessee Supreme Court recently considered whether a reimbursement cap imposed by TennCare was exempt from the UAPA rules promulgation process based on the general cost-control authority granted under Section 102(d). *Emergency Med.*, 671 S.W.3d at 518–20. In that case, TennCare argued that it was not required to follow the UAPA's notice-and-comment rulemaking requirements because the first sentence of Section 102(d) gave it authority to implement cost-control measures without any mention of rulemaking requirements. *Id.* at 519. Citing the last sentence of Section 102(d), the Supreme Court reasoned that "nothing about the UAPA's rulemaking requirements is 'contrary' to section 71-5-102(d)." *Id.* The Court "reject[ed] TennCare's reading of section 71-5-102(d) as a broad exemption from the UAPA's rulemaking requirements for cost-control measures." *Id.* at 520.

Relying on that case, TennCare argues that "the State DRA *would* be 'contrary' to the cost-cutting measures in the SPAs *if* the SPAs were deemed to violate the statute" (emphasis in original). However, to the extent that Section 102(d) conflicts with the State DRA, the State DRA controls. Under the principles of statutory construction, "when there is a conflict between statutes which were enacted at different times, 'the more specific and more recently enacted statutory provision' generally controls." *Chartis Cas. Co. v. State*, 475 S.W.3d 240, 246 (Tenn. 2015) (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 20 (Tenn. 2013)); *see also State v. Welch*, 595 S.W.3d 615, 622 (Tenn. 2020) ("Where a conflict is presented between two statutes, a more specific statutory provision takes precedence over a more general provision.") Courts "may presume that the General Assembly is aware of its own prior enactments and knows the state of the law when it enacts a subsequent statute." *Lovlace*, 418 S.W.3d at 20 (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010)). The State DRA, enacted in 2007, is more recent than Section 102(d), which was enacted in 2004. The State DRA is also more specific than Section 102(d). It applies specifically to the issue at hand (the payment methodology for emergency services furnished by noncontract providers for Medicaid managed care enrollees) whereas Section 102(d) applies to cost-control initiatives generally. We conclude that Section 71-5-102(d), a general grant of authority, does not displace the clear, specific text of the more recent State DRA and that SPAs 08-003 and 10-003 are not saved by TennCare's general authority to implement initiatives or program modifications to control costs of the TennCare program.

Our holdings above are dispositive of this appeal and, therefore, pretermit discussion of the fourth issue raised by TennCare.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's August 24, 2023, order granting partial summary judgment on Erlanger's declaratory relief claims. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellants, Division of TennCare, Department of Finance and Administration; Stephen Smith, in his official capacity as Director of TennCare; and Jim Bryson, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration.

_____
JOHN W. McCLARTY, JUDGE