RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

AMISUB (SFH), INC., dba Saint Francis Hospital;
Saint Francis Hospital-Bartlett, Inc.,
                    *Plaintiffs-Appellants*,

        *v.*

CIGNA HEALTH AND LIFE INSURANCE COMPANY,
                    *Defendant-Appellee*.

No. 23-5714

—————————————

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:21-cv-02308—John Thomas Fowlkes Jr., District Judge.

Argued:  March 20, 2025

Decided and Filed:  July 1, 2025

Before:  CLAY, BUSH, and BLOOMEKATZ, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:**  Jonathan E. Siegelaub, LASH & GOLDBERG, LLP, Miami, Florida, for Appellants.  Warren Haskel, MCDERMOTT WILL & EMERY LLP, New York, New York, for Appellee.  **ON BRIEF:**  Jonathan E. Siegelaub, Greg J. Weintraub, LASH & GOLDBERG, LLP, Miami, Florida, Robert E. Cooper, David R. Esquivel, Sara K. Morgan, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellants.  Warren Haskel, Joshua B. Simon, Dmitriy Tishyevich, John J. Song, MCDERMOTT WILL & EMERY LLP, New York, New York, for Appellee.

—————————————

## OPINION

—————————————

JOHN K. BUSH, Circuit Judge.  Saint Francis Hospital and Saint Francis Hospital-Bartlett (Hospitals), based in Tennessee, brought claims purporting to rely on their state's

common law for quantum meruit and unjust enrichment against Cigna Health and Life Insurance Company, a Connecticut-based insurer. The Hospitals claim that Cigna, under its health insurance policies, routinely pays less than reasonable value when the Hospitals provide emergency care to Cigna members. The Hospitals have no contract with Cigna constraining the amount the Hospitals can charge Cigna's members for emergency services. In other words, the Hospitals are, in insurance parlance, "out-of-network." Nonetheless, the Hospitals argue they have a quasi-contractual relationship with Cigna requiring it to pay more for emergency care than what its health insurance contracts provide. They base their argument on federal and state law requiring both that hospitals treat all emergency patients who need their care and that insurers cover emergency care. Essentially, the Hospitals believe Cigna has a duty to pay the full value of their services regardless of whether Cigna contracted with its members to limit its liability.[1]

We hold Cigna has no such duty and affirm the district court's judgment of dismissal.

## I.

Before delving into the facts of this case, we review some background on the industry and the legal scheme that existed during the events in question. A key distinction in health insurance is that between "in-network" and "out-of-network" care. When a healthcare provider has contracted with an insurer to set the prices the insurer and its members will pay, that provider is considered in-network. Insurers generally promise that they will pay the full cost for care from in-network providers, less cost-sharing amounts like copays, deductibles, and the like, which the member pays. An insurer can reliably make such promises because these fixed-price agreements limit the insurer's risk. Out-of-network providers, in contrast, have no agreement with the insurer setting prices in this manner. For care from out-of-network providers, an insurer's contract with its members will set out a formula for determining what it commits to

---

[1]We use reasonable value and full value interchangeably because they are the same in the context of implied contracts. After all, there is no set price for a service provided under an implied contract. And the common law would not compel a defendant to pay more than reasonable value for such a service. So, the service's "full" value should reach no higher than its reasonable value. It does not matter what sticker price, if any, the provider puts on its service after the fact.

pay. If the out-of-network provider charges more than that amount, the provider can—at least in some instances—"balance bill" the patient for the difference.

When it comes to emergency services, this equation has more variables. The Emergency Medical Treatment and Active Labor Act (EMTALA) mandates that emergency service providers, like the Hospitals, provide stabilizing emergency care to patients who need it, regardless of their ability to pay. 42 U.S.C. § 1395dd(b)(1). And under the Affordable Care Act (ACA), insurers must provide "coverage" for many types of care, including emergency services. 42 U.S.C. § 18022(a)(1), (b)(1). A Tennessee statute likewise requires insurers to provide "coverage" for emergency services.[2] Tenn. Code Ann. § 56-7-2355(b)(1). The Hospitals claim these laws put them at a disadvantage. According to this argument, because of EMTALA, Cigna knows out-of-network emergency service providers like the Hospitals cannot refuse to do business with Cigna members. So, the Hospitals believe, Cigna can and does underpay for out-of-network emergency services, forcing providers to chase after patients to receive fair compensation for their work.[3]

To the Hospitals' credit, there is little doubt that balance billing causes problems for both providers and patients. The nature of emergency care does not allow providers and patients to agree to prices ahead of time. An out-of-network provider can balance bill and try to collect from each patient after the fact, but doing so is costly. *See* Phillip Tseng et al., *Administrative Costs Associated with Physician Billing and Insurance-Related Activities at an Academic Health Care System*, 319 JAMA 691, 696 (2018). And many patients, quite simply, cannot pay. Liz Hamel et al., Kaiser Fam. Found., *The Burden of Medical Debt: Results from the Kaiser Family Foundation/New York Times Medical Bills Survey* 1 (2016), https://perma.cc/LC5P-PDTU. A patient facing a balance bill can attempt to negotiate a lower price after receiving services.

---

[2]The Tennessee General Assembly amended the statute after the events of this case to require "coverage" and "payment." *See* 2022 Pub. Acts, c. 784, eff. April 8, 2022.

[3]It's plausible that consumers take all this into account when choosing a health insurer—a consumer should be willing to pay less for health insurance that provides less compensation to out-of-network emergency care providers compared to insurance that provides more. In other words, it's plausible that consumers know what they are bargaining for and that therefore Cigna does not abuse EMTALA at the expense of providers and patients. Because on a motion to dismiss we make all reasonable inferences in favor of the complaint, we do not adopt these presumptions. *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021).

But in reality, patients rarely do so, perhaps because they do not realize they can, lack the expertise to know how much medical services are worth, or have minimal leverage. *See* Jennifer A. Brobst, *Open and Unashamed in an Era of Consumer Protection: Unconscionable Hospital Billing Practices and the Chargemaster Racket*, 51 U. Mem. L. Rev. 861, 879–80 (2021); Kelly A. Kyanko & Susan H. Busch, *Patients' Success in Negotiating Out-of-Network Bills*, 22 Am. J. of Managed Care 647, 647 (2016) (study participants who tried to negotiate balance bills were successful only 56% of the time). The Hospitals argue that insurers like Cigna are well positioned to alleviate some of these burdens. Insurers are "better bargainer[s]" because they are repeat players whose knowledge of the industry and control over many members' coverage give them the leverage to settle with providers faster and easier than individual patients could. *See* Saul Levmore, *Explaining Restitution*, 71 Va. L. Rev. 65, 72–73 (1985). In short, we recognize the industry-wide problem with balance billing for out-of-network emergency services that the Hospitals seek to address with this suit.

Now to the facts of this case. The Hospitals had a price agreement with Cigna respecting their emergency services, but that expired at the start of 2019. From then on, the Hospitals provided emergency care to Cigna's members as out-of-network providers. The Hospitals allege that Cigna consistently underpaid them for their emergency care, often paying them less than it paid to in-network providers. Given the systematic nature of the complaint's allegations, the Hospitals assert that their "legal claims are not based on alleged denials of benefits due under ERISA plans. Instead, the Hospitals allege that Cigna breached independent equitable duties owed directly to the Hospitals . . . to pay the reasonable value of the medical services rendered." Appellants Br. at 36. In other words, the Hospitals do not allege that Cigna failed to pay what its plans promise.

Instead, the Hospitals argue that Cigna has a duty recognized by Tennessee common law to pay the full cost of its members' out-of-network emergency care, even if Cigna has contracted with its members to limit the amount it will pay. The duty arises, they assert, because EMTALA and the ACA (or Tennessee's similar provision) force Cigna and the Hospitals to do business together. This, according to the Hospitals, creates a quasi-contractual relationship, which would

require Cigna under Tennessee law to pay reasonable costs for the Hospitals' emergency services.

On May 13, 2021, the Hospitals sued for quantum meruit, unjust enrichment, and breach of implied-in-fact contract under Tennessee law. On appeal, the Hospitals have dropped their breach of contract claim. And they have limited the scope of their quantum meruit and unjust enrichment claims to care provided between January 1, 2019 and June 30, 2021.

The district court granted Cigna's motion to dismiss under Federal Rules of Civil Procedure 8 and 12(b)(6). It gave three grounds: (1) the complaint violated Rule 8's pleading standards by not pleading information specific to each instance of underpayment, (2) Tennessee common law provides no basis for such a suit, and (3) ERISA preempts the ability of a state to allow such a suit. We review de novo a Rule 12(b)(6) dismissal. *Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 833 (6th Cir. 2024).

## II.

We can decide this case on the Hospitals' failure to plead a viable claim under Tennessee common law, regardless of whether ERISA preemption applies. Because we can affirm on any ground supported by the record, *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 571 (6th Cir. 2019), we also need not consider the district court's holding that the Hospitals should have included claim-specific information in the complaint.

Again, the Hospitals brought claims for quantum meruit and unjust enrichment. The elements of unjust enrichment in Tennessee are "1) a benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without the payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (cleaned up). Further, "a plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust." *Id.* Claims for quantum meruit and unjust enrichment are "essentially the same" in Tennessee law, *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966), and

the minor differences between them are not germane to this case, *see Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 305–06 (Tenn. 2024).

The parties debate at length whether the Hospitals have conferred a legally cognizable benefit on Cigna. Answering that question requires that we determine whether Cigna was obligated to pay the full value of the services the Hospitals provided to Cigna's members. If so, then Cigna might have "retained an unjust economic benefit by withholding money that it would otherwise be required to pay." *Prime Healthcare Servs. – Reno, LLC v. Hometown Health Providers Ins. Co.*, No. 21-cv-00226, 2022 WL 1692525, at *8 (D. Nev. May 26, 2022); *cf. Life & Cas. Ins. Co. of Tenn. v. Baber*, 79 S.W.2d 36, 38 (Tenn. 1935) (Insurer "cannot equitably be allowed to retain any part of the premiums received, whilst it wrongfully deprives the insured of all benefits which might hereafter arise to them from their payment." (quoting *Union Cent. Life Ins. Co. v. Pottker*, 33 Ohio St. 459, 467 (1878))). If not, then Cigna has met its legal obligations. *Cf. First Inv. Co. v. Allstate Ins. Co.*, 917 S.W.2d 229, 232 (Tenn. Ct. App. 1994) (Insurer "cannot be held responsible for risks that it did not contractually assume.").

To figure out what the law requires Cigna to pay, it helps to understand how Cigna becomes a party to emergency care suits. Start with the obvious proposition that uninsured patients are responsible for the full value of their care. Cigna only enters the picture if it contracts with patients to shoulder the burden of paying for their care. As part of its cost-sharing arrangement, Cigna only promised to pay for a portion of its members' out-of-network emergency care. Cigna's members were liable for the rest. And the Hospitals do not allege that Cigna failed to keep its end of the bargain. So, the Hospitals' argument is essentially that the law does not permit Cigna to contractually limit its liability in this way. For them to succeed, they must establish that the cost-sharing arrangement between Cigna and its members for emergency care was unlawful. But, as explained below, neither federal nor state law imposed a duty on Cigna during the relevant period to pay the full cost of its members' out-of-network emergency care. The absence of such a duty sounds the death knell for the Hospitals' claims.

### A. Whether Federal Law Compels Cigna to Pay Full Value

We first address federal law. The Hospitals point us to 42 U.S.C. § 18022, a provision of the ACA requiring insurers to provide "coverage" for different categories of care, including emergency services. We conclude this coverage requirement does not impose a duty on insurers to cover the full cost of their members' out-of-network emergency care.

Start with the text of the statute. The plain meaning of "coverage" does not imply that the full cost of a harm will be covered. In an insurance context, "coverage" refers to the types of harms that fall within the insurance contract. *Coverage*, Black's Law Dictionary (9th ed. 2009) ("Inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy."); Merriam Webster's Dictionary of Law (2011) ("a risk assumed by the terms of an insurance contract"); Oxford English Dictionary (2d ed. 1989) ("The aggregate of risks covered by an insurance policy."); *see also Bergmann v. Hutton*, 101 P.3d 353, 358 (Or. 2004) (interpreting "coverage" in a car insurance statute to mean "the universe of people, vehicles, and events that trigger the insurer's obligation to pay").

The ACA adopts this common understanding of coverage. In the ACA, "health insurance coverage" means the "benefits consisting of medical care . . . offered by a health insurance issuer." 42 U.S.C. § 300gg-91(b)(1). And § 18022 mandates that insurers offer "coverage that . . . provides for . . . emergency services," among other types of care. *Id.* § 18022(a), (a)(1), (b)(1)(B). In other words, § 18022 tells insurers *what types* of care they must include in members' plans, but not *how much* they must pay providers.

The relevant federal agencies promulgated a regulation to fill in this detail. *Cf. Wayman v. Southard*, 23 U.S. 1, 43 (1825). Specifically, 29 C.F.R. § 2590.715–2719A lays out three methods for valuing a provider's emergency services. It requires insurers to use whichever one gives the provider the highest amount—called the "greatest-of-three" rule. *See* 29 C.F.R. § 2590.715–2719A(b)(3)(i). The regulation expressly recognizes that a provider can charge more than the greatest-of-three amount and that it is the patient's responsibility, not the insurer's, to pay the difference. *See id.* The Hospitals don't challenge that regulation. Thus, the greatest-

of-three rule helps to show that § 18022's definition of "coverage" does not obligate an insurer to pay the full value of emergency services.

Looking at § 18022 in its entirety supports the same conclusion. Recall that EMTALA requires only emergency service providers—not other kinds of providers—to treat patients regardless of their ability to pay. The Hospitals contend this makes emergency service providers uniquely vulnerable to the threat of underpayment for their work. And they suggest that § 18022 fixed that problem by requiring insurers to pay the full value of members' out-of-network emergency care. But § 18022 requires insurers to provide "coverage" for far more than just emergency services, including mental health treatment, prescription drugs, laboratory services, chronic disease management, and pediatric services. *See* 42 U.S.C. § 18022(b)(1)(E)–(J). The Hospitals do not argue that § 18022 requires insurers to pay the full cost of all *those* services from an out-of-network provider. For us to hold as much would shock the healthcare system and dramatically diminish the up-to-now critical distinction between in-network and out-of-network care.

Further, after the events at issue in this lawsuit, Congress enacted the No Surprises Act (NSA), which gave providers an avenue to seek full reimbursement from insurers for their members' out-of-network emergency care. *See* 134 Stat. 2759–60, codified at 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II). That is exactly the relief the Hospitals want here. Yet "[t]he very fact that it was thought necessary to incorporate this provision in the [NSA] is a recognition that the pre-existing legislation did not have that effect." *Nagle v. Loi Hoa*, 275 U.S. 475, 481 (1928); *see also Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). The NSA also prohibits balance billing patients for out-of-network emergency services, suggesting Congress's awareness that under § 18022, emergency providers were not fully compensated for the full value of their services and would directly charge patients. Notably too, unlike § 18022, the NSA addresses only the provision of emergency services and one other type of care.[4] In sum, § 18022 was not Congress's fix to the

---

[4]The other type of care is "non-emergency services performed by nonparticipating providers at certain participating facilities." 134 Stat. 2768, codified at 42 U.S.C. § 300gg-111(b). This subsection is commonly

problem of insurers underpaying out-of-network emergency care providers; the NSA was. Indeed, large parts of the NSA would have been unnecessary had § 18022 been interpreted as the Hospitals contend.

For these reasons, we conclude the ACA's coverage requirement does not impose a duty on insurers to cover the full cost of their members' out-of-network emergency care.

### B. Whether Tennessee Law Compels Cigna to Pay Full Value

The Hospitals' argument fares no better under Tennessee law. During the events underlying this suit, Tenn. Code Ann. § 56-7-2355(b)(1) only required insurers to provide "coverage" for emergency services, just like the ACA. Tennessee enacted its statute a little more than a decade before Congress enacted the ACA, but we have seen no evidence that the meaning of "coverage" changed. *See* 1997 Pub. Acts, c. 524, eff. June 19, 1997. And the only Tennessee court that has analyzed § 2355(b)(1) did not allow the same type of suit that the Hospitals bring here. *See HCA Health Servs. of Tenn., Inc. v. BlueCross BlueShield of Tenn., Inc.*, No. M2014–01869–COA–R9–CV, 2016 WL 3357180 (Tenn. Ct. App. June 9, 2016). So we are not convinced that § 2355(b)(1) imposes the duty upon insurers that the Hospitals need.

The last place for the duty to exist is in Tennessee common law. The Hospitals cite various authorities to suggest that Tennessee common law independently imposes an equitable duty on insurers to pay the full cost of their insureds' out-of-network emergency care: *River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43 (Tenn. Ct. App. 2002), the Restatement (Third) on Restitution and Unjust Enrichment, and a series of out-of-state cases. None persuades.

### 1. *River Park*

Let's turn to *River Park*. There, River Park Hospital sued BlueCross BlueShield, an insurer, alleging that BlueCross underpaid for emergency services River Park provided to

---

understood to "protect[] patients from being billed by out-of-network doctors who provide treatment at in-network hospitals." Stephanie Armour, *Patients to Be Protected from Surprise Billing Under New Rule*, Wall St. J. (July 1, 2021), https://perma.cc/8ZYY-B6K4.

Tennessee Medicaid recipients that BlueCross covered. *River Park*, 173 S.W.3d at 49–50. Importantly, Tennessee contracted with BlueCross to cover the full cost of Medicaid beneficiaries' care in exchange for a flat, monthly fee. *Id.* at 49.

This arrangement proved dispositive in *River Park*. *Id.* at 59–60. As in our case, EMTALA forced River Park Hospital to treat patients. *Id.* at 59. Also as in our case, the question was how far the insurer's duty to pay extended. But in *River Park*, BlueCross's contract with Tennessee imposed a duty on it to cover the full cost of the Medicaid beneficiaries' care. The court could therefore allow an unjust enrichment claim against BlueCross, whether or not a statutory duty existed. *Id.* River Park Hospital entered the implied contract by virtue of EMTALA, and BlueCross entered it (up to the *full cost* of the Medicaid beneficiaries' care) by virtue of its contract with the state. *Id.*

Here, by contrast, the insurer has no contractual duty to pay the full cost of its members' emergency care. Cigna has only agreed to cover a portion of out-of-network emergency services, and the Hospitals do not argue that these plans violated the ACA's greatest-of-three rule. So even if we were certain that Cigna entered into a quasi-contractual relationship with the Hospitals, that implied contract would not compel Cigna to pay the full value of the Hospitals' services. *River Park* does not support a reading of Tennessee common law to hold otherwise.[5]

## 2. The Restatement

The Hospitals next cite an illustration in the Restatement to argue that an emergency care provider can recover in a scenario like theirs. *See* Restatement (Third) of Restitution and Unjust Enrichment § 22, cmt. g, illus. 10. That illustration cites *River Park*. *See id*. reporter's note g. But if the Restatement stands for what the Hospitals claim, then it demonstrates a flawed understanding of *River Park*. It would ignore that the insurer in *River Park* had contracted to fully cover the Medicaid beneficiaries' emergency care. *River Park*, 173 S.W.3d at 49. We therefore hesitate to apply the Hospitals' reading of the Restatement here, where that key predicate is missing.

---

[5]An unpublished Tennessee case reached the same conclusion under similar facts, strengthening our confidence in this analysis. *See HCA*, 2016 WL 3357180, at *11–12.

The Hospitals point to only one case, rendered by a district court under New York law, that has adopted this illustration from the Restatement. *See Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, 749 F. Supp. 3d 456, 474–75 (S.D.N.Y. 2024). But that district court, in addition to citing the Restatement, adopted its rule from a state trial court whose case involved a Medicare insurer with a duty to fully cover its beneficiaries' care, like the Medicaid insurer in *River Park*. *See N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 542–43 (Sup. Ct. 2011) ("*Wellcare*"). The district court in *Emergency Physician Services* did not account for the key fact that Medicare obligated the insurer in *Wellcare* to provide full coverage.[6] The non-Medicaid provider in *HCA,* by contrast, had no such obligation, as the Tennessee Court of Appeals recognized. *See HCA*, 2016 WL 3357180, at *11–12. Similarly, no such obligation may be imposed on Cigna, the insurer in this case who is not sued as a Medicaid provider. Consequently, neither the district court decision from New York nor the Restatement is sufficiently on point to persuade us to adopt the Hospitals' position.

### 3. Out-of-State Cases

The other cases that the Hospitals cite involve circumstances meaningfully different from those here. Three concern Medicaid insurers like *River Park* did.[7] One relates to a provider suing based on the terms of the insurer's plan, which the Hospitals say they are not doing. *Prime Healthcare*, 2022 WL 1692525, at *1–2. One involves a defendant insurer who only objected based on the provider's failure to plead specific instances of underpayment, like the Rule 8 issue here that we have declined to address. *Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, No. 13-CV-03101, 2015 WL 1954287, at *10 (E.D. Pa. Apr. 30, 2015). In another, the district court allowed a case to survive a motion to dismiss only because the provider pled that it conferred a benefit on the insurer, without analyzing whether such a claim was legally

---

[6]After oral argument in this case, the Nevada Supreme Court issued its decision in *UnitedHealthCare Ins. Co. v. Fremont Emergency Servs. (Mandavia), Ltd*, __P.3d__, 2025 WL 1667716 (Nev. 2025). That court found the Restatement and *Emergency Physician Services* persuasive, without adding analysis of its own. For the reasons stated, those sources do not persuade us, so neither does *Fremont*.

[7]*Appalachian Reg'l Healthcare v. Coventry Health & Life Ins. Co.*, No. 12-CV-114, 2013 WL 1314154 (E.D. Ky. Mar. 28, 2013); *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501 (Pa. Super. Ct. 2003); *N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540 (Sup. Ct. 2011).

cognizable. *HCA Health Servs. of Virginia, Inc. v. CoreSource, Inc.*, No. 3:19-CV-406, 2020 WL 4036197, at *6 (E.D. Va. July 17, 2020).

The rest of the cases are from Florida.[8] These are inapplicable because Florida had enacted a state-law version of the NSA, imposing a statutory duty on insurers to pay the full value of their members' out-of-network emergency care. Fla. Stat. §§ 627.64194, 641.513. Tennessee had no such statutory scheme during the events of this case.

\* \* \*

In sum, aside from pointing to opinions from one district court and one state court that did not consider the necessity of an insurer having a duty to fully cover emergency care, the Hospitals cite no case supporting their cause of action absent a statute or regulation imposing this duty on insurers.

### III.

In the final analysis, the Hospitals' theory for recovery under Tennessee common law is essentially a challenge to the cost sharing arrangement between Cigna and its members. For the period at issue, Cigna's method for splitting costs with its members did not offend federal or state statutory law. And Tennessee common law did not impose its own equitable obligation to that effect either.

Consequently, we **AFFIRM** the district court's dismissal of the Hospitals' complaint. Because this holding disposes of all the claims here, we need not reach the question of whether ERISA would preempt Tennessee from imposing such a duty as a regulation of cost sharing instead of a regulation of the price of healthcare services. We also **DENY** the Hospitals' motion to certify a question of law to the Tennessee Supreme Court.

---

[8]*Surgery Ctr. of Viera, LLC v. UnitedHealthcare, Inc.*, 465 F. Supp. 3d 1211 (M.D. Fla. 2020); *S. Broward Hosp. Dist. v. ELAP Servs., LLC*, No. 20-CV-61007, 2020 WL 7074645 (S.D. Fla. Dec. 3, 2020); *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 385 F. Supp. 3d 1289 (S.D. Fla. 2019); *Nat'l Lab'ys, LLC v. United Healthcare Grp., Inc.*, No. 17-CV-81178, 2018 WL 11260511 (S.D. Fla. Apr. 4, 2018); *Reva, Inc. v. Humana Health Benefit Plan of La., Inc.*, No. 18-20136-CIV, 2018 WL 1701969 (S.D. Fla. Mar. 19, 2018); *Merkle v. Health Options, Inc.*, 940 So. 2d 1190 (Fla. Dist. Ct. App. 2006).